UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

CITY OF NEWBURGH,

                Plaintiff,

   -against-

MARK SARNA, SARNA ENTERPRISES, INC., MT.
AIRY/AIRE ESTATES, INC., NEW WINDSOR
DEVELOPMENT CO., LLC, and DRAINAGE
DISTRICT #6—MT. AIRY ESTATES (THE
RESERVE), TOWN OF NEW WINDSOR, NEW
YORK,

                Defendants.

————————————————————————x

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2 5 10
```

09 Civ. 5117 (CM)(LMS)

### DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

McMahon, J.:

## **INTRODUCTION**

Plaintiff the City of Newburgh ("Plaintiff" or the "City") asserts a claim for violations of

the Clean Water Act ("CWA"), 33 U.S.C. § 1251 et seq., as well as state-law tort claims for

trespass and public nuisance against defendants Mark Sarna, Sarna Enterprises, Inc., Mt.

Airy/Aire Estates, Inc., New Windsor Development Co., LLC (collectively, the "Sarna

Defendants"), and Drainage District #6—Mt. Airy Estates (The Reserve), Town of New

Windsor, New York (the "Town of New Windsor" and, together with the Sarna Defendants,

"Defendants"). The City alleges that Defendants, in violation of the CWA and New York law,

are responsible for the discharge of unfiltered stormwater runoff from the Mt. Airy Estates

residential development (the "Development") into an adjacent reservoir known as Brown's Pond.

Now pending before the Court are Plaintiff's motion for a preliminary injunction and the Sarna Defendants' cross-motion to dismiss or, in the alternative, for summary judgment. For the reasons stated below, the Sarna Defendants' cross-motion to dismiss is granted in part and denied in part; Plaintiff's motion for a preliminary injunction is denied. Additionally, the Court *sua sponte* dismisses the Complaint as against the Town of New Windsor.

## BACKGROUND

### I.    Overview of the Regulatory Regime

The purpose of the CWA is to protect our Nation's waters. See 33 U.S.C. § 1251(a). The regulatory regime created by the CWA principally requires that the discharge of pollutants be regulated by permit. Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y., 273 F.3d 481, 486 (2d Cir. 2001). Section 1311(a) of the CWA mandates that "the discharge of any pollutant by any person shall be unlawful" "[e]xcept as in compliance" with other provisions of the statute. 33 U.S.C. § 1311(a). One such provision, § 1342, establishes a permit program, the National Pollutant Discharge Elimination System ("NPDES"), and provides for the issuance of discharge permits ("NPDES permits") that allow the holder to discharge pollutants at levels below thresholds incorporated in the permit. See 33 U.S.C. § 1342; Catskill Mountains, 273 F.3d at 486. The CWA authorizes each state to implement the NPDES through the state's own permit program as long as it conforms to federal guidelines approved by the Administrator of the Environmental Protection Agency ("EPA"). See 33 U.S.C. § 1342(b).

In New York, the NPDES is administered by the New York State Department of Environmental Conservation ("NYSDEC"), and is referred to as the State Pollution Discharge Elimination System ("SPDES"). See N.Y. Envtl. Conserv. Law §§ 17-0105(13), 17-0701.

2

Accordingly, the NYSDEC issues SPDES general permits for certain categories of regulated discharges, including stormwater runoff. See N.Y. Comp. Codes R. & Regs. tit. 6, § 750-1.21.

The permit at issue in this case is the SPDES General Permit for Stormwater Discharges from Construction Activity. In 1993, the NYSDEC issued permit GP-93-06 covering such discharges; subsequently, in 2003, the NYSDEC replaced GP-93-06 with the updated GP-02-01; and, in 2008, the NYSDEC replaced GP-02-01 with the current version of the permit, GP-0-08-001. A permit applicant can obtain coverage under GP-0-08-001 (or, previously, under GP-93-06 or GP-02-01) by filing with the NYSDEC a notice of intent ("NOI") to be covered by the permit. See N.Y. Comp. Codes R. & Regs. tit. 6, § 750-1.21(d). Prior to submitting the NOI, the applicant must have completed a Stormwater Pollution Prevention Plan ("SWPPP") that complies with the requirements of the permit. See, e.g., GP-0-08-001 Part II.A.

In addition to providing for enforcement by state agencies and the EPA, the CWA allows private parties to enforce its mandates in so-called "citizen suits." See 33 U.S.C. § 1365. However, at least sixty days prior to filing a citizen suit, the prospective plaintiff must provide notice of its claims to the potential defendants, the EPA and the state in which the violations allegedly occurred. See 33 U.S.C. § 1365(b)(1)(A); Catskill Mountains, 273 F.3d at 486.

**II.    Facts**

Unless otherwise noted, the facts relevant to the Sarna Defendants' cross-motion to dismiss are taken from the City's complaint (the "Complaint"), as well as from documents attached to or referenced in the Complaint. See Rothman v. Gregor, 220 F.3d 81, 88-89 (2d Cir. 2000). The Sarna Defendants submit a Rule 56.1 statement in support of their cross-motion to dismiss, and suggest that the Court may wish to convert their motion into one for summary judgment. (See Sarna Defs.' Mem. in Supp. of Cross-Mot. to Dismiss and Opposing Pl.'s Mot.

for Prelim. Inj., Sept. 25, 2009 ("Sarna Defs.' Mem."), at 2.)  The Court declines to do so at this early stage of the litigation.

With the exception of the Sarna Defendants' contention that this lawsuit was not authorized by the City of Newburgh's City Council (the "City Council")—an issue on which the Court ordered supplemental submissions—the Sarna Defendants' asserted grounds for dismissal pursuant to Rule 12(b)(6) are properly resolved based on the pleadings.  Several of the Sarna Defendants' arguments challenge the Court's subject-matter jurisdiction, and the Court may consider certain evidence outside the pleadings in determining whether subject-matter jurisdiction exists.  See Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings.").

In resolving Plaintiff's preliminary injunction motion, the Court considers the affidavits submitted by the parties to determine whether Plaintiff has met the requirements for an award of preliminary injunctive relief.

**A.    Parties**

The City of Newburgh is located in Orange County, New York, on the Hudson River about sixty miles north of New York City.  Brown's Pond (the "Pond") is a reservoir located in the Town of New Windsor, which is next to Newburgh, and also in Orange County.  The City of Newburgh owns Brown's Pond.  The Pond is classified as a Class A-Special ("Class A-S") fresh surface water.  See N.Y. Comp. Codes R. & Regs. tit. 6, § 701.4.  Class A-S waters are best used as "a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing."  Id.  Brown's Pond serves as a secondary supply of drinking water for the City of Newburgh.

The residential Development at Mt. Airy Estates is located adjacent to the southwestern corner of Brown's Pond. Defendant Mt. Airy/Aire Estates, Inc. is a corporation located at 15 Engle Street, Suite 100, Englewood, New Jersey.[1] Defendant Sarna Enterprises, Inc. ("Sarna Enterprises") is a corporation located at the same New Jersey address. Defendant Mark Sarna is an individual who also allegedly resides at that same New Jersey address. Defendant New Windsor Development Co., LLC ("New Windsor Development") is a limited liability company located at a different address in Livingston, New Jersey.

Throughout its Complaint, Plaintiff collectively refers to Mark Sarna, Mt. Airy Estates, Sarna Enterprises and New Windsor Development as "Sarna" or "defendant," and alleges that they have violated the CWA at the Development by causing the discharge of untreated stormwater into Brown's Pond.

Plaintiff has also sued the Town of New Windsor. Plaintiff alleges that easements owned or controlled by the Town include all or portions of the stormwater management system for the Mt. Airy Development. Plaintiff claims that it cannot be accorded complete relief unless the Town is a defendant.

## B.    Allegations in the Complaint

The Mt. Airy Development was initially designed in 1972. Mt. Airy Estates later purchased the project, but did not begin construction until the late 1990s. Plaintiff alleges that the Development's stormwater control measures, based on the original 1972 design, are outdated and inadequate. To date, 408 homes have been built, and an application is pending to add thirteen more.

---

[1] Plaintiff alleges that both "Mt. Airy" and "Mt. Aire" appear on the Sarna Defendants' correspondence and official records. (Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., Sept. 11, 2009 ("Pl.'s Mem."), at 1 n.1.) The Court will use the "Mt. Airy" spelling.

In 1999, the Sarna Defendants filed an NOI with the NYSDEC seeking coverage under GP-93-06 for stormwater discharges into Brown's Pond during construction. The NYSDEC eventually approved the Sarna Defendants' SWPPP on February 2, 2001. The SWPPP for the Development has since been modified with NYSDEC approval on several occasions. In its present form, the Development's SWPPP includes two stormwater retention basins, two dry detention ponds, an inspection and maintenance schedule, and additional erosion and sediment controls, such as sediment basins, sediment traps and sand filters.

The core allegation in the Complaint is that the Sarna Defendants' construction at the Mt. Airy Development is causing the discharge of untreated stormwater runoff into Brown's Pond. Plaintiff alleges several specific dates on which drainage was inadequate, such that untreated stormwater runoff discharged into Brown's Pond. The most recent such incident alleged in the Complaint occurred in mid-December 2008, after roughly three inches of rain over multiple days. Plaintiff claims that the brownish stormwater discharges are changing the naturally occurring color of Brown's Pond in violation of New York's water quality standards for turbidity and, thus, the SPDES permit and CWA. The City further claims that its water supply is threatened by the allegedly turbid discharges into Brown's Pond, the smaller of the City's two drinking water reservoirs.

The Complaint also alleges a series of CWA violations, dating back several years, documented in and/or prompting some form of administrative action. In 2003, the NYSDEC entered into a consent order with Mt. Airy Estates, in which Mt. Airy Estates did not contest that it had failed to comply with the applicable SPDES permit and violated State water quality standards for turbidity. Pursuant to the order, the Sarna Defendants paid a $5,000 penalty and agreed to install proper erosion and sediment control measures.

In 2004, the NYSDEC entered into another consent order, this time with Mark Sarna on behalf of Mt. Airy Estates, also for stormwater discharges in violation of State turbidity standards. The consent order established that this was at least the fourth documented violation of New York's Environmental Conservation Law ("ECL") at the Mt. Airy Development, and imposed another $5,000 penalty.

In June 2006, the U.S. Army Corps of Engineers ("ACOE") imposed a Cease and Desist Order on construction at the Development because fill allegedly had been placed in federal wetlands in violation of the CWA. In October 2006, the ACOE modified the Cease and Desist Order to authorize the continuation of limited construction contingent upon the Sarna Defendants' further modifying the stormwater retention basins, restoring and preserving the wetland areas and building an additional drainage basin. Several such obligations were formally imposed in an August 2007 Restorative Order rescinding the Cease and Desist Order. Plaintiff alleges that shortly after the Restorative Order was issued, on October 12, 2007, there was flooding and another failure of the stormwater management system at the Development. Plaintiff further claims that the Sarna Defendants have not yet completed the restoration work required by the ACOE's Order.

Plaintiff alleges that, since the 2004 consent order, the NYSDEC has inspected the Mt. Airy Development and noted deficiencies in its stormwater management system on several occasions. The Complaint identifies numerous specific dates on which the NYSDEC allegedly noted deficiencies in the Development's erosion and sediment control measures. For example, on May 23, 2008, the NYSDEC inspected the Mt. Airy site and noted five outstanding violations, including blocked catch basins, inadequate silt fencing and improper construction of a

sediment trap. The NYSDEC notified the Sarna Defendants of the violations by letter dated June 3, 2008.

The NYSDEC also found multiple deficiencies on September 3, 2008, including blocked catch basins, and again notified the Sarna Defendants by letter. Two months later, on November 7, 2008, the NYSDEC again noted blocked catch basins and improperly maintained silt fencing during an inspection, and again notified the Sarna Defendants of the violations by letter.

Finally, Plaintiff alleges that the Development's SWPPP fails to comply with the NYSDEC's technical design requirements. The Complaint alleges, for example, that two sediment basins are improperly designed, and that the detention ponds receive flows from areas larger than recommended by the NYSDEC. Further, Plaintiff claims that the Sarna Defendants have failed to comply with the procedural requirement that when the design of a proposed SWPPP deviates from the NYSDEC's technical standards, it must be submitted to the NYSDEC for a sixty-day review and approval period.

The Sarna Defendants allegedly plan to expand the Mt. Airy Development by building thirteen more homes on the only remaining vacant lot. Plaintiff alleges that the Sarna Defendants will rely on the existing—and allegedly inadequate—stormwater management system for the planned expansion.

C.    **Claims Asserted and Relief Requested**

The Complaint asserts three causes of action. The first is a CWA claim based on the alleged violations described above. Second, Plaintiff asserts a state-law claim for trespass. Plaintiff alleges that the Sarna Defendants, without the City's permission, have installed two stormwater drainage basins on City-owned land next to Brown's Pond, as well as a sediment barrier and filter in Brown's Pond itself (which the City also owns). Third, Plaintiff asserts a

8

state-law claim for public nuisance, alleging that stormwater runoff into Brown's Pond threatens the City's water supply.

The Complaint seeks the following ultimate relief: (1) a declaratory judgment that the Sarna Defendants have violated and continue to violate the CWA; (2) an injunction (a) prohibiting the planned expansion of the Development; (b) compelling the Sarna Defendants to achieve compliance with their SPDES permit; and (c) compelling the Sarna Defendants to remove its structures from City property; (3) civil penalties in the amount of the CWA's statutory maximum—$37,500 per day—for each alleged CWA violation; (4) damages of $5 million for the Sarna Defendants' alleged trespass on City land; and (5) reasonable costs and attorneys' fees.

## D.     Plaintiff's Notice Letter

On or about December 23, 2008, Plaintiff sent a letter (the "Notice Letter") giving notice of its intent to sue for violations of the CWA, as required by § 1365(b)(1)(A) of the CWA. The Notice Letter is attached as Exhibit A to Plaintiff's Complaint; proofs of receipt of the Notice Letter are attached as Exhibit B.

Plaintiff sent its Notice Letter to the EPA Administrator, the EPA's Regional Administrator, the U.S. Attorney General, the New York State Attorney General, the Commissioner of the NYSDEC, and to each of the Sarna Defendants—Mark Sarna, Sarna Enterprises, Mt. Airy Estates and New Windsor Development. The Notice Letter was not sent to defendant the Town of New Windsor, and nowhere mentions the Town of New Windsor as an alleged violator or possible defendant. The Notice Letter provides the name, address and telephone number of the party giving notice—Newburgh's City Manager. The body of the

9

Notice Letter is about nine pages long, and sets forth a condensed version of the violations alleged in the Complaint.

Well more than sixty days after giving notice, on June 2, 2009, Plaintiff commenced this action by filing its Complaint.

### E.    The NYSDEC Administrative Proceeding

In the interim, on April 30, 2009, the NYSDEC commenced an administrative proceeding alleging stormwater discharges at the Mt. Airy Development in violation of the ECL and GP-0-08-001 (and, previously, GP-02-01). The NYSDEC's complaint is attached as Exhibit C to the City's Complaint. The NYSDEC complaint named Mark Sarna and Mt. Airy Estates as respondents; the relief requested was a declaratory judgment, a civil penalty of $525,000 and an order compelling Mark Sarna and Mt. Airy Estates to undertake certain remedial measures.

The NYSDEC administrative action has since been voluntarily discontinued. As the motions before this Court were being briefed, on October 6, 2009, an NYSDEC Administrative Law Judge ("ALJ") granted the NYSDEC staff's motion to discontinue the enforcement action, with leave to refile. (See Supplemental Aff'n of Marc S. Gerstman in Opp. to Mot. to Dismiss and in Further Supp. of Mot. for Prelim. Inj., Oct. 16, 2009 ("Gerstman Reply Aff'n"), ¶ 32 & Ex. A (ALJ Decision).)

### III.    The Pending Motions

On September 11, 2009, Plaintiff moved for a preliminary injunction. Plaintiff seeks preliminary injunctive relief (1) compelling the Sarna Defendants to achieve compliance with the applicable SPDES permit by, inter alia, redesigning its stormwater management system and installing drainage basins on property not owned by the City; (2) compelling the Sarna Defendants to implement weekly testing by an independent party to evaluate the adequacy of the

Development's stormwater management system; (3) compelling the Sarna Defendants to remove unauthorized structures from City property; and (4) prohibiting expansion of the Development.

The Sarna Defendants have cross-moved to dismiss the Complaint on numerous grounds. One of the Sarna Defendants' asserted grounds for dismissal is that this lawsuit was not authorized by Plaintiff's City Council. At a conference on November 6, 2009, the Court gave Plaintiff two weeks to submit evidence showing that its City Council had authorized the commencement of this action. The City made its submission on November 17, 2009; on November 23, 2009, the Court accepted opposition papers from the Sarna Defendants.

The Court first considers the Sarna Defendants' motion to dismiss, concluding that Plaintiff has adequately pled its claims against the Sarna Defendants, but that the Complaint must be dismissed as against the Town of New Windsor. The Court then turns to the question of whether Plaintiff is entitled to preliminary injunctive relief, and finds that it is not.

## DISCUSSION

### I.    The Sarna Defendants' Cross-Motion to Dismiss

#### A.    Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe all claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Cargo Partner AG v. Albatrans, Inc., 352 F.3d 41, 44 (2d Cir. 2003); see also Roth v. Jennings, 489 F.3d 499, 510 (2d Cir. 2007).

However, to survive a motion to dismiss, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

11

reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing

Twombly, 550 U.S. at 556). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss

does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." Twombly, 550 U.S. at 555 (internal quotations,

citations and alterations omitted). Unless a plaintiff's well-pleaded allegations of fact have

"nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint

must be dismissed." Id. at 570; Iqbal, 129 S. Ct. at 1950-51.

### B.    This Lawsuit Was Authorized by the City Council

The Sarna Defendants argue that Plaintiff lacks the capacity to prosecute this action

because the lawsuit was not properly authorized by its City Council. They are wrong.

Pursuant to New York General City Law, where, as here, there is an

> absence of any provision of law or ordinance determining by
> whom or in what manner or subject to what conditions [the power
> "to institute, maintain and defend any action or proceeding in a
> court"] shall be exercised, the common council or board of
> aldermen or corresponding legislative body of the city shall . . .
> have power by ordinance to determine by whom and in what
> manner and subject to what conditions said power shall be
> exercised.

See N.Y. Gen. City Law §§ 20(1), 23(2). Plaintiff does not dispute that neither the Newburgh

City Code nor Newburgh City Charter contains any provision relating to the City's power to

institute and maintain litigation. Therefore, only the "common council . . . or corresponding

legislative body of the city"—here, Newburgh's City Council—has the power to determine by

whom, in what manner and subject to what conditions the City's power to sue shall be exercised.

See id. The Sarna Defendants contend that the City Council never exercised that power to

authorize this lawsuit, which therefore must be dismissed. See, e.g., Town of Claverack v. Brew,

12

277 A.D.2d 807, 809-10 (N.Y. App. Div. 3d Dep't 2000) (dismissing action to enforce zoning

laws for lack of capacity to sue because plaintiff failed to produce evidence establishing suit was

properly authorized by town board).

Plaintiff's supplemental submission on this issue includes the affidavits of Newburgh's

Mayor and four of its City Council members, each of whom avers that the lawsuit was voted on

and unanimously approved at executive sessions of the City Council on or about March 5, 2009

and May 21, 2009 (although no formal resolution was passed at either session). (See Second

Supplemental Aff'n of Marc S. Gerstman in Opp. to Mot. to Dismiss and in Further Supp. of

Mot. for Prelim. Inj., Nov. 17, 2009 ("Gerstman Supp. Aff'n"), Ex. A.)  Plaintiff's submission

also includes a copy of a resolution ("Resolution No. 177-2009") passed by the City Council on

November 16, 2009—ten days after the Court ordered Plaintiff to produce evidence of

authorization—which "ratifies retroactively all authority previously granted in Executive

Sessions of the City Council on . . . March 5, 2009 and May 21, 2009 authorizing commencing

litigation under the Clean Water Act for the protection of Brown's Pond."  (Id. Ex. B.)

Having considered both sides' supplemental submissions, the Court concludes that

Plaintiff has the capacity to prosecute this action.  The City, through its Council, plainly supports

this action, and wishes it to proceed.  Even if there remains some uncertainty as to whether it was

properly authorized in the first place, it would be a waste of time and resources to dismiss this

case on the ground that Plaintiff lacks capacity to sue, only to have the Council vote to refile it

immediately.  Accordingly, the Court concludes that this action is authorized, and turns to the

Sarna Defendants' other asserted grounds for dismissal.

## C.    Plaintiff's Notice Letter

The Sarna Defendants argue that Plaintiff's December 23, 2008 Notice Letter was

inadequate, requiring dismissal of the CWA claim.  After carefully reviewing the Notice Letter,

the Court concludes that it provided sufficient notice to the Sarna Defendants of the CWA

violations alleged in the Complaint.  However, the Notice Letter was not sent to defendant the

Town of New Windsor, and thus did not provide adequate (or any) notice to the Town.

Accordingly, the CWA claim against the Town must be dismissed.  The Court declines to

exercise supplemental jurisdiction over the remaining state-law claims against the Town (to the

extent those claims are even asserted against it), and therefore *sua sponte* dismisses the

Complaint in its entirety as against the Town of New Windsor.

### 1.    Plaintiff's Notice Letter Provided Adequate Notice to the Sarna Defendants

At least sixty days prior to filing a CWA citizen suit, the prospective plaintiff must

provide notice of its claims to the potential defendants, the EPA and the state in which the

violations allegedly occurred.  See 33 U.S.C. § 1365(b)(1)(A); Catskill Mountains Chapter of

Trout Unlimited, Inc. v. City of N.Y., 273 F.3d 481, 486 (2d Cir. 2001).  The legislative policy

behind requiring such notice is that it affords an opportunity for the alleged violator to bring

itself into compliance with the CWA, or for the enforcer of first resort, the EPA or the

appropriate state agency, to institute an enforcement action.  See Hallstrom v. Tillamook County,

493 U.S. 20, 29 (1989); Catskill Mountains, 273 F.3d at 488.  The EPA has specified the content

requirements for a prospective plaintiff's notice letter:

> Notice regarding an alleged violation of an effluent standard or
> limitation or of an order with respect thereto, shall include
> sufficient information to permit the recipient to identify the
> specific standard, limitation, or order alleged to have been violated,
> the activity alleged to constitute a violation, the person or persons

> responsible for the alleged violation, the location of the alleged
> violation, the date or dates of such violation, and the full name,
> address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a); see Catskill Mountains, 273 F.3d at 488 ("In practical terms, the notice

must be sufficiently specific to inform the alleged violator about what it is doing wrong . . . ."

(quoting Atl. States Legal Found., Inc. v. Stroh Die Casting Co., 116 F.3d 814, 819-20 (7th Cir.

1997))).

Strict compliance with the CWA's notice provision "is a mandatory, not optional,

condition precedent for suit." See Hallstrom, 493 U.S. at 26; Klebe v. Tri Mun. Sewer Comm'n,

No. 07 Civ. 7071, 2008 U.S. Dist. LEXIS 102014, at *11-12 (S.D.N.Y. Dec. 17, 2008); see also

Bettis v. Ontario, 800 F. Supp. 1113, 1118 (W.D.N.Y. 1992) ("[T]he [CWA's] 'notice

requirement is not a mere technical wrinkle of statutory drafting or formality to be waived by the

federal courts.'" (quoting Walls v. Waste Resource Corp., 761 F.2d 311, 316 (6th Cir. 1985))).

However, the Second Circuit "refuse[s] to 'allow form to prevail over substance' in

considering the content required of [a notice] letter," and "look[s] instead to what the particular

notice given may reasonably be expected to accomplish." See Catskill Mountains, 273 F.3d at

487 (quoting Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir. 1991)), rev'd in part on

other grounds, 505 U.S. 557 (1992)). Thus, in determining whether a CWA plaintiff's notice

letter is adequate, a court "must consider whether the[] notice letter served the purpose that

Congress intended." Hudson Riverkeeper Fund v. Putnam Hosp. Ctr., 891 F. Supp. 152, 155

(S.D.N.Y. 1995) (quoting Pub. Interest Research Group of N.J. v. Hercules, Inc., 50 F.3d 1239,

1249 (3d Cir. 1995)).

The Sarna Defendants contend that Plaintiff's Notice Letter failed to comply with the

content requirements set forth in 40 C.F.R. § 135.3(a). The Sarna Defendants point to Catskill

Mountains, Klebe and CARS v. U.S. Army Corps of Engineers, No. 04 Civ. 0328, 2005 U.S. Dist. LEXIS 38404 (W.D.N.Y. Dec. 23, 2005), each of which found a CWA plaintiff's notice letter to be inadequate. (See Sarna Defs.' Mem. at 17-22.) Each situation differs significantly from this one.

In Catskill Mountains, the Second Circuit held that plaintiff's notice letter was inadequate as to certain of the alleged CWA violations because it failed to name every alleged pollutant. 273 F.3d at 488. Judge Walker reasoned that "a plaintiff could not bring suit for discharges of mercury, lead, and copper if the [notice] letter alleged violations based only on discharges of copper. In that case, the claims of copper violations would stand, but the claims based on mercury and lead discharges would need to be dismissed." Id. at 487. In Klebe, Judge Karas applied Catskill Mountains, holding that where "Defendant's SPDES permit sets limits on 12 different pollutants, Plaintiffs cannot have given proper notice of Defendant's specific violations merely by broadly accusing Defendant of having discharged 'unpermitted waste products' into the Hudson River." 2008 U.S. Dist. LEXIS 102014, at *16-18 (internal citation omitted) (finding inadequate a 1.5-page notice letter devoid of specific allegations).

Here, Plaintiff's Notice Letter clearly established that the alleged pollutant is untreated stormwater runoff into Brown's Pond. The Sarna Defendants, unlike the defendants in Catskill Mountains and Klebe, cannot credibly claim to have been confused about what they were accused of discharging in violation of their SPDES permit.

The Sarna Defendants rely heavily on CARS, which they assert is "on point." (Sarna Defs.' Mem. at 19.) In CARS, as here, construction by developer defendants allegedly violated the CWA. 2005 U.S. Dist. LEXIS 38404, at *2-3. However, the notice letter in CARS did not even "state the waters into which the alleged stormwater [was] being discharged." Id. at *24. It

16

also did not specify the ways in which defendants' SWPPP allegedly failed to comply with their SPDES permit. Id. at *24-25. The notice letter merely stated that the developer defendants had "failed to conform" to the SPDES permit. Id. at *25. The court found this insufficient. Id.

Plaintiff's Notice Letter in this case does not contain any such glaring deficiencies. To the contrary, the Notice Letter satisfied 40 C.F.R. § 135.3 by "includ[ing] sufficient information to permit the recipient[s] to identify," inter alia: (1) the Sarna Defendants as the alleged violators; (2) the State water quality standard for turbidity, N.Y. Comp. Codes R. & Regs. tit. 6, § 703.2 (which is incorporated in each of the relevant SPDES permits—GP-93-06, GP-02-01 and GP-0-08-001), certain erosion and sediment control design requirements for the Development's SWPPP, and the 2006 ACOE Restorative Order, as the "standard[s], limitation[s], or order[s]" allegedly violated; (3) Brown's Pond as the location of the alleged violations; (4) the discharge of untreated stormwater runoff as the (principal) activity allegedly constituting the violations; and (5) numerous specific dates on which violations allegedly occurred. (See, e.g., Notice Ltr. at 6-7 (alleging that construction-related activities at the Development "have caused and are causing storm water runoff to migrate from the development directly into Brown's Pond"), 7-8 (alleging specific technical deficiencies in Development's SWPPP), 10 (detailing alleged failure of stormwater management system on December 12, 2008).)

The Sarna Defendants also assert that the Complaint contains "entirely new allegations not specified in the Notice [Letter]." (Sarna Defs.' Mem. at 21.) Each of the arguments they offer in support of this contention is easily dispatched.

First, the Sarna Defendants claim that the Complaint alleges for the first time that the Mt. Airy Development's stormwater management system failed on October 12, 2007. (Compl. ¶ 58.) In fact, the Notice Letter states that "Inadequate drainage of storm water runoff occurred and was

17

observed on September 21, 2007, *October 12, 2007*, March 8, 2008, and March 10, 2008."
(Notice Ltr. at 9 (emphasis added).)

Second, the Sarna Defendants claim that "Paragraphs 93 through 96 [of the Complaint]
raise entirely new dates of alleged violation." (Sarna Defs.' Mem. at 21.) Those paragraphs
allege that NYSDEC inspections noted blocked catch basins on September 3, 2008 and
November 7, 2008, and that the stormwater control measures failed on December 12, 2008.
Plaintiff's Notice Letter describes in detail the alleged incident on December 12, 2008. (See
Notice Ltr. at 10.) Although the Letter does not specifically mention the dates September 3 and
November 7, 2008, it does allege that the NYSDEC noted five violations on May 23, 2008,
including blocked catch basins, which "remain outstanding." (Id.) Those blocked catch basins
were once again noted by the NYSDEC on September 3 and November 7. (See Compl. ¶¶ 92-
94.) Thus, the Court concludes that the Notice Letter provided adequate notice of the violations
alleged on those two dates. See 140 C.F.R. § 135.3(a) (requiring only that a notice letter
"include sufficient information to permit the recipient to identify . . . the date or dates," not that it
include an exhaustive list of every specific date).

Third, the Sarna Defendants assert that "Paragraphs 76 through 79 of the complaint make
entirely new allegations that the SWPPP fails to meet design standards, because the SWPPP does
not contain water quantity controls." (Sarna Defs.' Mem. at 21.) In fact, Plaintiff devotes more
than two pages of its Notice Letter to describing the alleged technical shortcomings in the Sarna
Defendants' SWPPP, and references "water quality and quantity controls." (See Notice Ltr. at 7-
9.)

Fourth, the Sarna Defendants claim that paragraph 83 of the Complaint alleges for the
first time that the infractions alleged in paragraph 82 are violations of GP-02-01. (Sarna Defs.'

Mem. at 21.) The Sarna Defendants are grasping at straws. Paragraph 82 sets forth a list of dates on which the NYSDEC allegedly noted erosion and sediment control deficiencies; paragraph 83 alleges that those deficiencies are violations of GP-0-08-001 and GP-02-01. Plaintiff's Notice Letter lists the same dates and states that the noted deficiencies are violations of GP-0-08-001, but neglects to mention GP-02-01. (See Notice Ltr. at 9.) Regardless, it is quite clear from the Notice Letter that Plaintiff is alleging that the erosion and sediment control deficiencies—many of which were noted well before GP-0-08-001 went into effect—violated the applicable SPDES permit for stormwater discharges from construction activity.

Finally, the Sarna Defendants argue that the Complaint makes new allegations regarding the 2006 ACOE Restorative Order not contained in the Notice Letter. It is true that the allegations in the Complaint concerning the Restorative Order are more specific than those in the Notice Letter. Yet the Notice Letter discusses the ACOE Cease and Desist Order and subsequent Restorative Order, as well as the Sarna Defendants' restoration and monitoring obligations under that Order. (See id. at 6.) The Court deems the Notice Letter's references to the ACOE Restorative Order sufficient to alert the Sarna Defendants of the alleged violations thereof.

In sum, the Court concludes that Plaintiff's Notice Letter "served the purpose that Congress intended." See Hudson Riverkeeper Fund, 891 F. Supp. at 155. It was sufficiently specific to inform the Sarna Defendants of what they are allegedly doing wrong. See Catskill Mountains, 273 F.3d at 488.

## 2. The Complaint Must Be Dismissed as Against the Town of New Windsor

Plaintiff's Notice Letter did not, however, afford adequate—or indeed any—notice to defendant the Town of New Windsor. Accordingly, Plaintiff's CWA claim against the Town must be dismissed for failure to comply with the pre-suit notice requirement of § 1365(b)(1)(A).

Plaintiff alleges that the Town of New Windsor has received numerous easements (many of which were granted several years ago) into its "Drainage District #6," and that those easements include all or portions of the stormwater management system for the Mt. Airy Development. (See Compl. ¶¶ 9-10; Pl.'s Mem. at 16-17.) Only one other paragraph in the Complaint even mentions Drainage District #6; it alleges that Drainage District #6 is "a party without whom the Court cannot accord complete relief to plaintiff." (Compl. ¶ 22.) In its principal brief, Plaintiff states that the "Town of New Windsor, through Drainage District #6[,] has acknowledged responsibility for compliance with portions of the stormwater management system and the SWPPP, including maintaining the basins located on City property," and that the Town is "not maintaining the basins and stormwater system as evidence[d] by the continuing discharges into Brown's Pond." (Pl.'s Mem. at 17.) The Court construes the Complaint as at least attempting to assert a CWA claim against the Town.

As noted above, a CWA citizen suit cannot be brought until sixty days after the prospective plaintiff has "given notice of the alleged violation . . . to any alleged violator." 33 U.S.C. § 1365(b)(1)(A). Obviously, a notice letter cannot provide notice to an alleged violator if it is not *sent* to the alleged violator. When the alleged violator is a town, the notice letter must be served personally or by registered mail on the "head of [the] agency" allegedly responsible for the violation. See 40 C.F.R. § 135.2(a)(2); Bettis, 800 F. Supp. at 1118.

In Bettis, several of the defendants "never received a notice of any kind." 800 F. Supp. at 1118. Moreover, they "were never named in the notices or letters." Id. Thus, they "were not apprised of anything at all." Id. The district court in Bettis expressed a willingness to overlook some of the "more technical" deficiencies in the pro se plaintiff's notice letter, but not the fact that certain defendants had not even received the letter. See id.

Here, the Complaint alleges that Plaintiff's Notice Letter was sent to Mark Sarna and "to the registered agent for each of the remaining defendants." (Compl. ¶ 5.) But there is no indication that the Letter was sent to the Town of New Windsor. The proofs of receipt attached to the Complaint do not include one for the Town. Neither the case caption on the Notice Letter, nor its list of "Proposed Defendants" to which "Notice Is Hereby Provided," name the Town of New Windsor. (Notice Ltr. at 1.) The Letter's nine-page summary of Plaintiff's allegations mentions the Town only twice, and only to state that the Mt. Airy Development is located therein, and that Brown's Pond serves as a secondary water supply for the Town. (See id. at 3.)

Yet the Town of New Windsor has not raised a notice argument—only the Sarna Defendants have moved to dismiss the Complaint. Indeed, the Town answered the Complaint on July 10, 2009. (Docket No. 10.) Perhaps tellingly, the Town's answer includes paragraph 5 of the Complaint—in which Plaintiff alleges that notice has been provided pursuant to § 1365(b)(1)(A)—as one of the many paragraphs deemed "not directed to this defendant," such that "no response is made thereto." (Id.) It is true that Plaintiff's Notice Letter in no way addresses the Town.

Instead, the Court raises this issue of its own accord. The Court may very well be obligated to do so because it implicates the Court's subject-matter jurisdiction. See Hallstrom, 493 U.S. at 31. In Hallstrom, the Supreme Court considered the sixty-day notice provision of the Resource Conservation and Recovery Act of 1976 ("RCRA")—which, as the Court noted, is substantively identical to the CWA's sixty-day provision—and held that it is a "mandatory condition[] precedent to commencing suit," which "a district court may not disregard . . . at its discretion." See id. at 22 n.1, 31. However, the Court declined to decide whether the sixty-day notice provision is "jurisdictional in the strict sense of the term." Id. at 31. Nevertheless, the

21

Court held that the action must be dismissed—even "after years of litigation and a determination on the merits"—because plaintiff had failed to comply with the pre-suit notice requirement. Id. at 32.

In his dissent, Justice Marshall acknowledged that the majority opinion "might be read to suggest that failure to comply with the 60-day notice provision deprives the court of subject-matter jurisdiction, thereby obligating a court to dismiss a case filed in violation of the notice provision no matter when the defendant raises the issue—indeed, regardless of whether the defendant does so." Id. at 34 n.*. However, because "the question whether a defendant may waive the notice requirement [was] not before the Court," Justice Marshall "[did] not understand the Court to express any view on whether the notice requirement is waivable." Id.

Since Hallstrom, most, though not all, of the Courts of Appeals to consider the issue have concluded that the CWA's pre-suit notice provision implicates a federal court's subject-matter jurisdiction. See Ctr. for Biological Diversity v. Marina Point Dev. Co., 560 F.3d 903, 910 (9th Cir. 2009) ("[T]he giving of a 60-day notice . . . is a jurisdictional necessity."); Bd. of Trustees v. City of Painesville, 200 F.3d 396, 400 (6th Cir. 2002) ("This circuit has always required plaintiffs to adhere to § 1365's notice provision because compliance with the notice requirement is a jurisdictional prerequisite to recovery under the statute."); Atl. States Legal Found. v. Stroh Die Casting Co., 116 F.3d 814, 820 (7th Cir. 1997) (characterizing § 1365(b)(1)(A) as a "jurisdictional requirement[]"); Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1295-96 (1st Cir. 1996) (assuming that a plaintiff's failure to comply with the CWA's sixty-day notice provision would "deprive [a court] of jurisdiction," and designating the § 1365(b)(1)(A) issue as "jurisdictional"); Pub. Interest Research Group v. Windall, 51 F.3d 1179, 1189 n.15 (3d Cir. 1995) ("[Section § 1365(b)(1)(A)] is a jurisdictional prerequisite."); see also N.M. Citizens for

Clean Air & Water v. Espanola Mercantile Co., 72 F.3d 830, 834 n.2 (10th Cir. 1996) ("[W]e need not decide the intriguing issue so carefully left open by Hallstrom—whether a mandatory precondition to suit is a component of non-waivable 'subject matter jurisdiction.'"). But see Am. Canoe Ass'n, Inc. v. Attalla, 363 F.3d 1085, 1088 (11th Cir. 2004) ("[A]lthough subject matter jurisdiction may be raised at any time, the [CWA's] notice requirement is more procedural than jurisdictional."); Lockett v. E.P.A., 319 F.3d 678, 682-83 (5th Cir. 2003) (holding that CWA's sixty-day notice requirement, "although mandatory, is not jurisdictional in the strict sense of the term, and hence may not be availed of for the first time on appeal" (internal quotations omitted)).

The Second Circuit has not definitively answered this question. In Catskill Mountains, the Second Circuit's most comprehensive discussion of the CWA's pre-suit notice requirement, the panel reviewed the district court's denial of defendant's "Rule 12(b)(1) motion" to dismiss for "want of jurisdiction" because plaintiff's notice letter had been inadequate—and appears to have assumed that the question was one of subject-matter jurisdiction. See 273 F.3d at 485-89. More recently, however, in 2006, the Second Circuit stated, in dicta, and in a footnote, that "For purposes of this appeal, we assume that non-compliance with the pre-suit notice provisions of . . . the Clean Water Act does not affect a federal court's subject matter jurisdiction," but that "we do not decide that issue, because we conclude that dismissal of the plaintiff's amended complaint is warranted in any event." See Bldg. & Constr. Trades Council of Buffalo v. Downtown Dev., Inc., 448 F.3d 138, 157, 158 n.14 (2d Cir. 2006) (remanding to district court with instruction that it dismiss the complaint without prejudice on the ground that plaintiff had failed to comply with the sixty-day delay requirement).

District courts in this Circuit, however, have consistently treated the CWA's notice requirement as a question of subject-matter jurisdiction. See, e.g., Klebe, 2008 U.S. Dist. LEXIS

102014, at *18 (dismissing CWA claim for lack of subject-matter jurisdiction because notice letter was inadequate); CARS, 2005 U.S. Dist. LEXIS 38404, at *17, 27 (same); Hudson Riverkeeper Fund, 891 F. Supp. at 153-55 (same); Bettis, 800 F. Supp. at 1115-16 (same). But see Anglebrook, 891 F. Supp. at 906 n.9 (declining to resolve question of "[w]hether defective notice is jurisdictional or merely procedural" because "the [plaintiff's] notice was adequate").

The Court does not think it necessary to take a position on the question left open by Hallstrom. The weight of the authority treating the CWA's pre-suit notice provision as jurisdictional makes this Court inclined to raise the issue *sua sponte*. Regardless of whether compliance with § 1365(b)(1)(A) is a jurisdictional or merely procedural requirement, it is "a mandatory, not optional, *condition precedent for suit*," which this Court may not disregard. See Hallstrom, 493 U.S. at 26 (emphasis added). Simply put, the fact that Plaintiff's Notice Letter was not even *sent* to the Town of New Windsor, and did not so much as *mention* the Town as a possible violator, are not deficiencies that this Court can overlook. If Plaintiff wishes to bring a CWA citizen suit against the Town for failing to maintain the Mt. Airy Development's stormwater management system, Plaintiff must comply with the CWA's pre-suit notice requirement.

Accordingly, the only appropriate remedy is to dismiss the CWA claim against the Town, "without prejudice to refiling after full compliance with § 1365(b)(1)(A)." See Catskill Mountains, 273 F.3d at 489; see also Hallstrom, 493 U.S. at 32-33 (holding that where citizen-suit plaintiff fails to meet sixty-day notice requirement, "the district court must dismiss the action"). Although this course of action may not seem the most efficient use of judicial resources, see Hallstrom, 493 U.S. at 32, it is necessary to further the purpose of the CWA's notice requirement—that is, affording government regulators the opportunity to bring an

enforcement action before a citizen suit is commenced. Further, the Court notes that by dismissing the claim now, it avoids potentially having to do so at an even later stage of the case.

Having dismissed the CWA claim against the Town of New Windsor, the Court declines to exercise supplemental jurisdiction over the state-law nuisance and trespass claims, to the extent those claims are asserted against the Town (the Complaint contains only a handful of references to Drainage District #6, none of which alleges wrongdoing of any sort, so it is difficult to tell). Accordingly, the Complaint is dismissed in its entirety as against the Town of New Windsor, without prejudice to Plaintiff's refiling.

### C. The NYSDEC Administrative Proceeding Precludes Plaintiff from Seeking Civil Penalties for the CWA Claims

The Sarna Defendants argue that this citizen suit is barred under § 1319(g)(6) of the CWA as a result of the NYSDEC's administrative enforcement action, which was filed on April 30, 2009, more than a month before Plaintiff filed its citizen-suit Complaint. Section 1319(g)(6) does apply, but it only bars Plaintiff from seeking civil penalties—not declaratory or injunctive relief—for the alleged CWA violations.

#### 1. Section 1319(g)(6) Applies to Administrative Enforcement Actions

Section 1319(g)(6) of the CWA mandates that violations "with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection . . . shall not be the subject of a civil penalty action under [§ 1365] of this Act." 33 U.S.C. § 1319(g)(6). An administrative enforcement proceeding qualifies as an "action" for purposes of applying § 1319(g)(6). See Orange Env't, Inc. v. County of Orange, 860 F. Supp. 1003, 1014 (S.D.N.Y. 1994) ("[Section 1319(g)(6)] precludes a citizen suit where a state is diligently prosecuting an administrative penalty enforcement action.").

25

Plaintiff correctly asserts that an administrative proceeding does *not* qualify as an "action" for purposes of § 1365(b)(1)(B), which bars a citizen suit "if the [EPA] Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(B); see Friends of the Earth v. Conrail, 768 F.2d 57, 63 (2d Cir. 1985) (holding that, pursuant to its plain language, § 1365(b)(1)(B) applies only if the EPA or state action is brought in state or federal *court*). However, § 1319(g)(6), not § 1365(b)(1)(B), is the relevant bar in this case. Cf. Kara Holding Corp. v. Getty Petroleum Mktg., Inc., 67 F. Supp. 2d 302, 308 (S.D.N.Y. 1999) (finding that although NYSDEC administrative action did not trigger § 1365(b)(1)(B), "[a]n additional layer of complexity is added by 33 U.S.C. § 1319(g)(6)(A)(ii)," as its "preclusive effect is not only accorded to actions in state courts").

Section 1319(g)(6) specifies two situations in which its limitation on citizen suits does not apply: (1) where the citizen suit is filed before the commencement of the state action, or (2) where the prospective plaintiff gives notice of its intent to file a citizen suit before the commencement of the state action, and the plaintiff then files the citizen suit within 120 days after giving notice. See 33 U.S.C. § 1319(g)(6)(B). Neither exception applies here. Plaintiff filed its citizen suit on June 2, 2009, about a month after the commencement of the NYSDEC's administrative action, and more than 120 days after sending its Notice Letter in late December 2008.

### 2.    The NYSDEC Action Was Brought Under Comparable State Law

For § 1319(g)(6)'s limitation on citizen suits to apply, the state action must be brought under "comparable" state law. Here, Plaintiff alleges that the Sarna Defendants have violated § 1311(a) of the CWA by discharging a pollutant not in compliance with the applicable SPDES

26

permit. The NYSDEC brought its suit under Article 17 of New York's ECL—and, specifically, ECL § 17-0803, which implements the CWA by mandating that "it shall be unlawful to discharge pollutants to the waters of the state from any outlet or point source without a SPDES permit . . . or in a manner other than as prescribed by such permit"—seeking a civil penalty pursuant to ECL § 71-1929. There is no question that ECL Article 17 and § 71-1929 are "comparable" to the federal CWA scheme. See Orange Env't, 860 F. Supp. at 1015 (concluding, in CWA citizen suit alleging that defendants discharged pollutants into river in violation of §§ 1311(a), that ECL Article 17 and § 71-1929 were comparable state statutes).

### 3.    The Diligent Prosecution Requirement Is Met

Plaintiff argues that § 1319(g)(6) does not limit its citizen suit because the diligent prosecution requirement is not satisfied. First, the fact that the NYSDEC action has been voluntarily discontinued does not affect the analysis. Section 1319(g)(6) bars the *commencement* of a CWA citizen suit for civil penalties if a state has filed and is diligently prosecuting an analogous enforcement action. See 33 U.S.C. § 1319(g)(6). Thus, "the relevant inquiry for defendants' motion to dismiss is not whether or not the DEC's actions can currently be categorized as diligent, but whether or not they could be so categorized [when the citizen suit was commenced]." See Orange Env't, 860 F. Supp. at 1017. This seems particularly sensible here, as the NYSDEC could reinstitute its action at any time.

Plaintiff claims that the NYSDEC was not diligently prosecuting the action even before it was discontinued. However, "the standard for evaluating the diligence of the state in enforcing its action is a low one which requires due deference to the state's plan of attack." Id.; see N. & S. Rivers Watershed Ass'n, Inc. v. Scituate, 949 F.2d 552, 557 (1st Cir. 1991) ("Where an agency has specifically addressed the concerns of an analogous citizen's suit, deference to the

agency's plan of attack should be particularly favored."); Conn. Fund for Env't v. Contract Plating Co., 631 F. Supp. 1291, 1293 (D. Conn. 1986) (Cabranes, J.) (holding, in CWA citizen suit, that "[t]he court must presume the diligence of the State's prosecution of a defendant absent persuasive evidence that the State has engaged in a pattern of conduct in its prosecution of the defendant that could be considered dilatory, collusive or otherwise in bad faith"). Thus, a plaintiff claiming that state prosecution is not diligent bears a heavy burden, which comports with the "main purpose behind [§ 1319(g)(6)'s] limitation of citizen suits . . . to permit the federal and state governments to exercise their powers to remedy violations of the Clean Water Act." See N.Y. Coastal Fishermen's Ass'n v. N.Y. City Dep't of Sanitation, 772 F. Supp. 162, 165 (S.D.N.Y. 1991); see also Gwaltney of Smithfield v. Chesapeake Bay Found., Inc., 484 U.S. 49, 60 (1987) ("The bar on citizen suits when governmental enforcement action is under way suggests that the citizen suit is meant to supplement rather than to supplant governmental action.").

Here, the NYSDEC filed its administrative complaint on April 30, 2009, more than a month before Plaintiff commenced this citizen suit. The NYSDEC complaint named Mark Sarna and Mt. Airy Estates as respondents, and targeted the same conduct alleged in Plaintiff's Complaint—the "discharges [of] stormwater into Brown's Pond." (See NYSDEC Compl. at 1.) Plaintiff conclusorily alleges, in a single sentence, that "There has not been diligent prosecution to redress the violations alleged." (Compl. ¶ 7.) That is far from enough to satisfy Plaintiff's heavy burden of showing a lack of diligent prosecution. Further, the fact that the relief requested by the NYSDEC is more limited than that sought by Plaintiff does not affect the Court's conclusion. Cf. Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc., 777 F. Supp. 173, 185 (D. Conn. 1991) (finding that Connecticut Department of Environmental Protection had

diligently prosecuted its action against defendant even though the state action was "more limited in scope than the relief [the] plaintiff [was] requesting"), aff'd in part and rev'd in part, 989 F.2d 1305 (2d Cir. 1993). Finally, although Plaintiff claims that the NYSDEC has failed since 2003 to obtain "substantial relief" for the Sarna Defendants' alleged violations at the Mt. Airy Development (Pl.'s Reply Mem. in Opp. to Mot. to Dismiss and in Further Supp. of Mot. for Prelim. Inj., Oct. 20, 2009 ("Pl.'s Reply Mem."), at 12), there is no indication that the NYSDEC has "engaged in a pattern of conduct . . . that could be considered dilatory, collusive or otherwise in bad faith," see Conn. Fund, 631 F. Supp. at 1293.

Accordingly, the Court holds that, because the NYSDEC was diligently prosecuting an enforcement action addressing the same conduct alleged by Plaintiff when it filed its Complaint, § 1319(g)(6)'s limitation on citizen suits applies. See Orange Env't, 860 F. Supp. at 1006, 1017 (holding that plaintiff's CWA citizen suit for civil penalties was barred because of NYSDEC's "administrative action concerning the situation alleged in the complaint," and noting that "the DEC's actions and enforcement decisions are entitled to a good degree of deference").

### 4.  Section 1319(g)(6) Only Precludes the Civil Penalty Component of Plaintiff's CWA Suit

Section 1319(g)(6) does not bar Plaintiff's CWA suit in its entirety. As the Sarna Defendants acknowledge, courts in this Circuit have held that § 1319(g)(6)'s limitation on citizen suits applies only to CWA claims for *civil penalties*, not to claims for declaratory judgments or injunctive relief. See, e.g., Orange Env't, 860 F. Supp. at 1017-18; Coalition for a Liveable W. Side, Inc. v. N.Y. City Dep't of Envtl. Protection, 830 F. Supp. 194, 197 (S.D.N.Y. 1993); Atl. States Legal Found., Inc. v. Hamelin, 182 F. Supp. 2d 235, 248 (N.D.N.Y. 2001). This interpretation of § 1319(g)(6) is supported by its plain language, and by the relevant House Committee Report, which states:

> No one may bring an action to recover civil penalties under
> [§ 1365 of the CWA] for any violation with respect to which the
> Administrator has commenced and is diligently prosecuting an
> administrative civil penalty action . . . . This limitation would not
> apply to (1) an action seeking relief other than civil penalties (e.g.,
> an injunction or declaratory judgment).

H.R. Conf. Rep. No. 1004, 99th Cong., 2d Sess., at 133 (1986).

Accordingly, having found that the NYSDEC's enforcement action satisfies the

prerequisites for § 1319(g)(6) preclusion, the Court grants the Sarna Defendants' motion to

dismiss the *civil penalties* component of Plaintiff's CWA claim. The Court denies the Sarna

Defendants' motion as to Plaintiff's CWA claim for injunctive and declaratory relief.

### D.    Plaintiff Has Adequately Pled That the Alleged CWA Violations Are Continuous

Section 1365 of the CWA authorizes citizen suits against "any person . . . alleged to be *in*

*violation*" of state or federal effluent standards or limitations. 33 U.S.C. § 1365(a)(1) (emphasis

added). The Supreme Court has held that this language does not confer federal subject-matter

jurisdiction over citizen suits for "wholly past violations." Gwaltney, 484 U.S. at 64. Instead, a

plaintiff bringing a citizen suit must "allege a state of either continuous or intermittent

violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the

future." Id. at 57; see Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp., 993 F.2d 1017,

1019 (2d Cir. 1993). At this stage of the proceedings, a plaintiff's "good-faith allegation of

continuous or intermittent violation" will defeat a motion to dismiss for lack of subject-matter

jurisdiction. See Gwaltney, 484 U.S. at 64; Conn. Coastal Fishermen's Ass'n v. Remington

Arms Co., 989 F.2d 1305, 1311-12 (2d Cir. 1993); Mut. Life Ins. Co. v. Mobil Corp., No. 96

Civ. 1781, 1998 U.S. Dist. LEXIS 4513, at *11 (N.D.N.Y. 1998).

Plaintiff's Complaint satisfies the continuous violation requirement. The Complaint specifies numerous dates, beginning in 2004 and running through 2008, on which NYSDEC inspections allegedly noted sediment and erosion control deficiencies at the Development. (Compl. ¶¶ 82, 92-95.) The Complaint also alleges several dates in 2007 and 2008, including as recently as December 12, 2008, on which the Development's stormwater management system failed during rainfall. (Id. ¶¶ 87, 96.) In short, the allegations in the Complaint give rise to the inference that there is a "reasonable likelihood" that the Sarna Defendants are past polluters that "will continue to pollute in the future." See Gwaltney, 484 U.S. at 57.

Moreover, the Complaint also alleges that the current SWPPP for the Mt. Airy Development fails to comply with technical design requirements. (Id. ¶¶ 69-70, 75, 79-81.) A flawed SWPPP filed in violation of permit requirements can constitute a "present violation" of the CWA. See Anglebrook, 891 F. Supp. at 905.

Thus, the Court finds that Plaintiff's Complaint contains good-faith allegations of continuous violation, defeating the Sarna Defendants' motion to dismiss for lack of subject-matter jurisdiction.

### E.    The Sarna Defendants' Motion to Dismiss the Complaint Pursuant to Rule 12(b)(6) for Failure to State a Claim Is Denied

In addition to arguing that the Complaint must be dismissed for lack of subject-matter jurisdiction, the Sarna Defendants move to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim. (Sarna Defs.' Mem. at 13-17.) Principally, the Sarna Defendants argue that the Complaint should be dismissed because its allegations "lump" them together. That argument fails. Plaintiff has adequately pled its claim for violations of the CWA, as well as its state-law claims for trespass and public nuisance.

### 1.    The Complaint States a Claim for Violations of the CWA

Plaintiff's CWA claim alleges violations of 33 U.S.C. § 1311(a), which prohibits the "discharge of any pollutant" except in compliance with an NPDES or SPDES permit. See 33 U.S.C. §§ 1311(a), 1342. The CWA defines "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Sarna Defendants do not dispute that untreated stormwater runoff qualifies as a "pollutant," that Brown's Pond qualifies as "navigable waters," and that the runoff is allegedly occurring from "point sources," as those terms are defined in the CWA. See 33 U.S.C. § 1362(6), (7), (14).

The Complaint alleges that the discharge of stormwater runoff at the Development violates the applicable SPDES permit because it causes the turbidity of Brown's Pond to rise above permissible levels. The Complaint also alleges, inter alia, that the Sarna Defendants are in violation of their SPDES permit because the SWPPP for the Development fails to comply with current erosion and sediment control design requirements. Both these and other alleged CWA violations are amply supported by detailed, factual allegations.

Accordingly, the Court has little trouble concluding that Plaintiff's CWA claim meets Rule 8(a)'s pleading standard.

### 2.    The Complaint States a Claim for Trespass

"Under New York law, trespass is the intentional invasion of another's property." Scribner v. Summers, 84 F.3d 554, 557 (2d Cir. 1996) (citing Ivancic v. Olmstead, 488 N.E.2d 72, 74 (N.Y. 1985), cert. denied, 476 U.S. 1117 (1986). "To be liable, the trespasser 'need not intend or expect the damaging consequences of his intrusion[;]' rather, he need only 'intend the act which amounts to or produces the unlawful invasion.'" Id. (quoting Phillips v. Sun Oil Co., 121 N.E.2d 249, 250-51 (N.Y. 1954)). "The intrusion itself 'must at least be the immediate or

inevitable consequence of what [the trespasser] willfully does, or which he does so negligently as to amount to willfulness.'" Id. (quoting Phillips, 121 N.E.2d at 251).

The Sarna Defendants do not dispute that the City of Newburgh owns Brown's Pond, as well as certain property adjacent to the Pond.  The Complaint alleges that the Sarna Defendants, "in contravention of the terms of the easement, without permission . . ., intentionally built and installed two storm water drainage basins on [City] property and erected a sediment barrier and a water outlet structure within Brown's Pond." (Compl. ¶ 103.)  The Complaint further alleges that, "As a consequence of [the Sarna Defendants'] actions, . . . the value of the property has been negatively impacted." (Id. ¶ 122.)

The Court concludes that Plaintiff has adequately pled the elements of a claim for trespass.

### 3.    The Complaint States a Claim for Public Nuisance

Under New York law, a public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to . . . interfere with the use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." Copart Indus., Inc. v. Consol. Edison Co., 362 N.E.2d 968, 971 (N.Y. 1977).  A public nuisance is an offense against the State and is subject to abatement or prosecution by the proper governmental authority.  Id.

Here, the Sarna Defendants have allegedly violated the CWA by causing the discharge of turbid stormwater into Brown's Pond, a reservoir serving the City.  The Complaint alleges that the Sarna Defendants' "actions in violating the CWA threaten the City's secondary water supply and do damage to the rights of the citizens of the City in an adequate drinking water supply." (Compl. ¶ 126.)  The City of Newburgh "is a proper party to bring an action to restrain a public

nuisance that allegedly may be injurious to the health and safety of its citizens." See N.Y. State
Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1361 (2d Cir. 1989) (citing N.Y. Trap Rock
Corp. v. Town of Clarkstown, 85 N.E.2d 873, 877 (N.Y. 1949)).

Thus, the Court holds that Plaintiff has stated a claim for public nuisance under New
York law.

### 4.    The Sarna Defendants' "Lumping" Argument Fails

The Sarna Defendants argue that the Complaint should be dismissed as against Mark
Sarna, Sarna Enterprises and New Windsor Development (but not, apparently, Mt. Airy Estates)
because it "lumps those defendants together," and "fails to make specific or particularized
allegations against [them]." (See Sarna Defs.' Mem. at 13, 17.) While it is true that the
Complaint is not a model of pleading with respect to specifying the role of each Sarna
Defendant, this shortcoming does not warrant dismissal.

At the beginning of its Complaint, Plaintiff introduces the Sarna Defendants, three of
whom—Mark Sarna, Sarna Enterprises and Mt. Airy Estates—allegedly share the same address
in Englewood, New Jersey. Thereafter, the Complaint refers collectively to those three
defendants, together with New Windsor Development, as "Sarna" or "defendant." (See Compl.
¶ 21.) The allegations in the Complaint permit the reasonable inference that Mark Sarna, Sarna
Enterprises, New Windsor Development and Mt. Airy Estates are the owners and/or operators of
the Mt. Airy Development, and are responsible for the CWA violations allegedly occurring at
that site.

The Sarna Defendants rely on two cases, In re Amaranth Natural Gas Commodities
Litigation, 612 F. Supp. 2d 376 (S.D.N.Y. 2009), and Abdelhamid v. Altria Group, Inc., 515 F.
Supp. 2d 384 (S.D.N.Y. 2007), in arguing that the Complaint is "fatally defective" because it

"lumps" together Mark Sarna, Sarna Enterprises and New Windsor Development. (See Sarna Defs.' Mem. at 13, 16-17.) Neither case has any bearing on this one.

In re Amaranth is a class action alleging that defendants manipulated the natural gas market in violation of the Commodity Exchange Act ("CEA"). 612 F. Supp. 2d at 379. In an earlier opinion in the litigation, Judge Scheindlin had held that plaintiffs' CEA claims sounded in fraud, and that "plaintiffs' allegations of commodities manipulation must satisfy Rule 9(b)." Id. at 382. Accordingly, in the opinion cited by the Sarna Defendants, Judge Scheindlin evaluated plaintiff's commodities fraud claims pursuant to the heightened pleading requirements of Rule 9(b), *not* the more relaxed standard of Rule 8(a).

Plaintiff's CWA and state-law claims in this case are, of course, subject to Rule 8(a), not Rule 9(b). Thus, that Judge Scheindlin dismissed CEA claims in In re Amaranth because plaintiffs' allegations of commodities fraud were not sufficiently particularized has no bearing on whether Plaintiff has met its pleading burden here. To the extent Judge Scheindlin dismissed certain claims for vicarious liability under the CEA for failure to satisfy Rule 8(a), that is likewise irrelevant, as those claims required plaintiffs to plead a principal-agent relationship between the relevant defendants. See id. at 393-97. In any event, the Sarna Defendants' "lumping" argument is one traditionally made in the context of *fraud* cases—often securities fraud cases—where the complaint is subject to Rule 9(b), not Rule 8(a). This is a CWA suit, not a fraud case.

As for Abdelhamid, the complaint in that case was subject to Rule 8(a), but the allegations therein were qualitatively different from those at issue here. The Abdelhamid plaintiff asserted negligence claims against Altria Group, Inc. ("Altria") and Philip Morris International ("PMI") arising out of his wife's death by electrocution at a concert in Egypt. 515

F. Supp. 2d at 389. Judge Scheindlin held that the complaint failed to state a claim because plaintiff's allegations that Altria and PMI were liable for the accident were "simply not plausible." Id. at 397 (finding that there were "no facts alleged in the [complaint]" from which the court could reasonably infer liability). Indeed, in the very same opinion, Judge Scheindlin sanctioned plaintiff's counsel for having known that there was no factual support for many of the allegations in the complaint. See id. at 400. The "lumping" of defendants was not at issue.

The situation here is far different. Plaintiff's Complaint sets forth good-faith factual allegations of CWA violations at the Mt. Airy Development. And, as noted above, the Complaint gives rise to the reasonable inference that Mark Sarna, Mt. Airy Estates, Sarna Enterprises and New Windsor Development are liable for those violations. Thus, Plaintiff has satisfied the Rule 8(a) "plausibility" standard as set forth in Twombly, 550 U.S. at 570.

In sum, the Court holds that the Complaint states claims against the Sarna Defendants for violations of the CWA, as well as for trespass and public nuisance.

### F.    Mark Sarna Is a Proper Defendant

The Sarna Defendants argue that the Complaint should be dismissed as against individual defendant Mark Sarna because the only allegations in the Complaint that name Mr. Sarna relate solely to his role as a corporate officer of Mt. Airy Estates, and because the Complaint does not contain any allegation that could provide a ground for piercing the corporate veil. The Sarna Defendants also note that Mr. Sarna submitted an affidavit in the NYSDEC enforcement proceeding, denying any involvement in the alleged violations. (Sarna Defs.' Mem. at 29.)

Plaintiff responds by arguing that under the "responsible corporate officer" doctrine, Mr. Sarna may be held personally liable without piercing the corporate veil. Plaintiff also contends that even if veil piercing is required, Mr. Sarna is not entitled to the protection of the corporate

shield, as certain of the entities that he represents are not properly incorporated and/or registered to do business in New York.

For the reasons stated below, the Court concludes that it would be premature to dismiss Mr. Sarna at this stage.

Section 1311(a) of the CWA regulates "the discharge of any pollutant by any *person*." 33 U.S.C. § 1311(a) (emphasis added). "Except as otherwise specifically provided, when used in [the CWA] . . . [t]he term 'person' means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a state, or any interstate body." 33 U.S.C. § 1362(5). Under § 1319(c)(6), which covers criminal penalties for CWA violations, "the term 'person' means, in addition to the definition contained in [§ 1362(5)], any responsible corporate officer." 33 U.S.C. § 1319(c)(6).

The responsible corporate officer doctrine was first articulated by the Supreme Court in United States v. Dotterweich, 320 U.S. 277, 284 (1943), which held that a corporate officer is criminally liable under a public welfare statute—in Dotterweich, the Federal Food, Drug, and Cosmetic Act—if he had "a responsible share in the furtherance of the transaction which the statute outlaws." The few courts (all outside this Circuit) that have expressly considered the question of whether the responsible corporate officer doctrine applies in a civil CWA case have concluded that it does. See, e.g., Humboldt Baykeeper v. Simpson Timber Co., No. 06 Civ. 4188, 2006 WL 3545014, at *4 (N.D. Cal. Dec. 8, 2006) ("[T]he Clean Water Act . . . permit[s] the imposition of penalties, even criminal penalties, against individuals merely because they are in positions of authority at polluting companies.").

In Humboldt, the president of a timber company allegedly violating the CWA moved to dismiss the complaint as against him personally, "argu[ing] that Plaintiffs ha[d] made no specific

allegations of wrongdoing against him as an individual, nor any allegations that would support an attempt to pierce the corporate veil." Id. at *1, 3. Judge Breyer rejected the defendant's argument, holding that "individuals whose acts or omissions have led to [the] pollution may be held responsible individually, notwithstanding the fact that they may have been acting in their capacity as an employee or officer of a company or entity that owns the property in question or conducts business on it." Id. at *4 (citing United States v. Iverson, 162 F.3d 1015, 1022-26 (9th Cir. 1998)).

Courts have generally rejected the notion that the responsible corporate officer doctrine should not apply in civil CWA cases because the phrase "responsible corporate officer" only appears in the *criminal* penalties provision of the CWA. As the Sixth Circuit noted in a case involving another public welfare statute, the Radiation Control for Health and Safety Act of 1968:

> [T]he rationale for holding corporate officers criminally responsible for acts of the corporation, which could lead to incarceration, is even more persuasive where only civil liability is involved, which at most would result in a monetary penalty. The fact that a corporate officer could be subjected to criminal punishment upon a showing of a responsible relationship to the acts of a corporation that violate health and safety statutes renders *civil* liability appropriate as well.

United States v. Hodges X-Ray, Inc., 759 F.2d 557, 561 (6th Cir. 1985) (emphasis in original).

For example, in Franklin v. Birmingham Hide & Tallow Co., No. 98 Civ. 0259, 1999 U.S. Dist. LEXIS 22489 (N.D. Ala. Apr. 22, 1999), the corporate-officer defendant argued that he could not be held personally liable for his company's violations of its NPDES permit. He argued that because the "responsible corporate officer" language is included only in the criminal penalties provision of the CWA, a responsible corporate officer can only be held criminally—not civilly—liable. See id. at *45. The district court denied the defendant's motion to dismiss,

38

stating that "a number of courts have found that corporate officers who are responsible for violations of public health statutes, including the CWA, may be both civilly and criminally liable in their individual capacity for such violations, notwithstanding that the wrongful actions were undertaken on behalf of a corporate entity." Id. at *43-44 (citing United States v. Gulf Park Water Co., 972 F. Supp. 1056 (S.D. Miss. 1997); United States v. Mac's Muffler Shop, Inc., No. 85 Civ. 138R, 1986 U.S. Dist. LEXIS 18108 (N.D. Ga. Nov. 4, 1986)).

Similarly, in Puget Soundkeeper Alliance v. Tacoma Metals, Inc., No. 07 Civ. 5227, 2008 U.S. Dist. LEXIS 60741, at *32 (W.D. Wash. Aug. 5, 2008), the corporate-officer defendant argued that he could not be held liable for the acts of his corporation in a CWA citizen suit because "there is a significant difference between the criminal provisions and the civil provisions of the Clean Water Act." The court rejected that argument, holding that "Defendant is not entitled to summary judgment dismissing Plaintiff's claims against him based solely on the facts that he is a corporate officer of Tacoma Metals and that Plaintiff's alleged violations were the acts of Tacoma Metals." Id. at *35 (internal quotations omitted); see also Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., No. 00 Civ. 1967, 2005 U.S. Dist. LEXIS 43006, at *38-39 (E.D. Cal. Aug. 19, 2005) (denying individual defendant's summary judgment motion because "the responsible corporate officer doctrine has been applied to both criminal and civil cases").

Courts in this Circuit have not addressed the specific question of whether the responsible corporate officer doctrine applies in a civil CWA case. However, the Second Circuit's decision in United States v. Pollution Abatement Services, Inc., 763 F.2d 133 (2d Cir. 1985) ("PAS"), is instructive. In that case, the complaint alleged that defendant PAS was discharging refuse into a creek in violation of the Rivers and Harbors Act of 1899 (the "Rivers and Harbors Act"). Id. at 133-34. The Rivers and Harbors Act was a precursor to the CWA; like the CWA, it was

"designed to protect and preserve our Nation's navigable waterways." See United States v. Penn. Indus. Chem. Corp., 411 U.S. 655, 663 (1973).

The district court in PAS had found that the individual defendants—PAS's president and vice president—were personally liable because, "by reason of their respective positions and activities in [PAS], and by reason of their activities, [they] had the responsibility and the authority either to prevent, in the first instance, or promptly to correct the violations complained of, and they failed to do so." 763 F.2d at 133-34. In determining that the individual defendants were personally accountable for the violations, the district court also noted that PAS was a small, closely held corporation—the individual defendants were two of only four shareholders. Id.

The sole issue on appeal in PAS was whether personal liability could be imposed on the individual defendants. Id. at 134. The Second Circuit had "not previously held individual corporate officers personally liable for violations of the Rivers and Harbors Act." Id. at 135. The individual defendants argued that the imposition of civil liability was improper because § 16 of the Rivers and Harbors Act, which allowed a "person" to be held *criminally* responsible for violating the statute, was "wholly irrelevant" in a civil suit. Id. The Second Circuit disagreed, and affirmed the district court's imposition of personal liability on the two corporate officers. Id. The court explained that its holding "comported with [the Second Circuit's] expansive construction of remedial environmental statutes." Id. (citing New York v. Shore Realty Corp., 759 F.2d 1032, 1052 (2d Cir. 1985) (holding corporate officer individually liable without piercing the corporate veil under an analogous statute, the Comprehensive Environmental Response, Compensation and Liability Act of 1980); United States v. Am. Cyanamid Corp., 480 F.2d 1132, 1135 (2d Cir. 1973) (eschewing a "cramped reading" of the Rivers and Harbors Act and focusing on its broad remedial purposes)). The PAS court noted that "the liability imposed

upon [the individual defendants] was not premised solely on their corporate offices or ownership, but was bottomed on their personal involvement in the firm's activities." Id.

Here, Plaintiff's Complaint gives rise to a plausible inference that the unifying link between the three New Jersey-based entities named as defendants—Sarna Enterprises, Mt. Airy Estates and New Windsor Development—is Mark Sarna himself, and that Mr. Sarna may be personally liable as a responsible corporate officer for the alleged violations. The Complaint alleges that the NYSDEC entered into the 2004 consent order "with Mark Sarna on behalf of Mt. Aire Estates," and that the order detailed the alleged violations of State turbidity standards at the Development. (Compl. ¶ 47.) In addition, the Complaint alleges that on August 25, 2008, the NYSDEC sent a notice of violation for erosion and sediment control deficiencies to "Mr. Sarna of Mt. Airy Estates." (Id. ¶ 82.)

The Court declines to consider, on this motion to dismiss, Mr. Sarna's affidavit denying that he had any role in the alleged violations. Cf. Humboldt, 2006 WL 3545014, at *4 (declining individual defendant's invitation to convert motion to dismiss into motion for summary judgment and "rely upon his affidavit, in which he assert[ed] that he has never had any involvement as an individual in any activity that might have caused the alleged contamination of the Site"). Whether Mr. Sarna was personally involved may well be relevant to the result in this case—PAS suggests that personal involvement in polluting activity is a basis for corporate officer liability— but the facts need to be fleshed out in discovery. It is irrelevant that Mr. Sarna was dismissed from the NYSDEC administrative enforcement action because that proceeding was brought under state law, not the CWA. Indeed, the very fact that the NYSDEC complaint originally named Mr. Sarna as a defendant suggests that Mr. Sarna may very well be a proper defendant here. The Court knows nothing about the corporate defendants and whether they are able to fund

41

any remedial actions that may be required if Plaintiff prevails. Further, if the corporate defendants are closely held corporations, <u>PAS</u> suggests that Mr. Sarna may be appropriately named.

Accordingly, and in the absence of any authority in this Circuit holding that a responsible corporate officer may not be held personally liable for violations of the CWA, the Court holds that it would be premature to dismiss the Complaint as against Mr. Sarna. The Court need not address Plaintiff's claim—unsupported by any factual allegations in the Complaint—that Mr. Sarna is not entitled to the protection of the corporate shield because certain of the entities he represents were not properly incorporated and/or registered to do business in New York. Mr. Sarna's role in the entities named as defendants is a matter to be fleshed out during discovery. He is, at least for now, a proper defendant in this CWA suit.

Finally, with respect to the state-law trespass and nuisance claims, it is well-established that under New York law, piercing the corporate veil is not required to hold a corporate officer liable for his company's torts: "a corporate officer who controls corporate conduct and thus is an active individual participant in that conduct is liable for the torts of the corporation." <u>Shore Realty</u>, 759 F.2d at 1052 (holding individual defendant personally liable for public nuisance without piercing the corporate veil) (citing <u>LaLumia v. Schwartz</u>, 257 N.Y.S.2d 348, 350 (1965)). Further, "This general rule is particularly appropriate in the public nuisance context where everyone who . . . participates in the . . . maintenance . . . of a nuisance are liable jointly and severally." <u>Id.</u> (internal quotations omitted).

Thus, for many of the same reasons articulated above, the Court finds that the allegations in the Complaint raise a plausible inference that Mark Sarna controlled corporate conduct, and

that he may be liable for the alleged torts of nuisance and trespass. Thus, the motion to dismiss the Complaint as against Mr. Sarna is denied.

## II.    Plaintiff's Preliminary Injunction Motion

Having determined that the Complaint states CWA, nuisance and trespass claims against the Sarna Defendants, the Court turns to Plaintiff's motion for a preliminary injunction. Plaintiff seeks an injunction compelling the redesign of the Mt. Airy Development's stormwater management system, including the installation of new drainage basins, weekly testing by an independent party and removal of structures from City-owned property, and prohibiting a thirteen-home expansion of the Development. (See Pl.'s Mem. at 18-19.) For the reasons stated below, the Court finds that Plaintiff fails to meet the heavy burden of showing that it is entitled to preliminary injunctive relief.

### A.    Legal Standard for Obtaining a Preliminary Injunction

The Supreme Court recently reiterated the standard for obtaining a preliminary injunction: "a plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. NRDC, Inc., 129 S. Ct. 365, 374 (2008). A preliminary injunction "is not a remedy which issues as of course." Weinberger v. Romero-Barcelo, 456 U.S. 305, 311 (1982) (quoting Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 337-38 (1933)). Rather, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 129 S. Ct. at 375-76. "[I]n making such a showing the movant bears a heavy burden." New York v. Nuclear Regulatory Comm'n, 550 F.2d 745, 750 (2d Cir. 1977) ("NRC").

43

**B.  Plaintiff Has Failed to Establish the Threat of Irreparable Harm**

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations omitted); see NRC, 550 F.2d at 750 ("[A] clear showing of the threat of irreparable harm . . . is a fundamental and traditional requirement of *all* preliminary injunctive relief."). To be irreparable, the injury must be one that "cannot be remedied by monetary damages." Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998) (internal quotations omitted). "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is *sufficiently likely*, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 545 (1987) (emphasis added).

The threat of irreparable harm must not be merely speculative, but "actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Faiveley, 559 F.3d at 118 (internal quotations omitted); see NRC, 550 F.2d at 750 ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat . . . ." (quoting Holiday Inns of Am., Inc. v. B&B Corp., 409 F.2d 614, 618 (3d Cir. 1969)); City of N.Y. v. Anglebrook Ltd. P'ship, 891 F. Supp. 908, 925 (S.D.N.Y. 1995) (holding that "there must be some actual, viable, presently-existing threat of serious harm"). "In other words, the City must show that the injury complained of is of such imminence that there is a clear and present need for relief to prevent irreparable harm." Anglebrook, 891 F. Supp. at 925 (internal quotations omitted). As the Supreme Court recently made clear, a preliminary injunction must not be issued "based only on a possibility of

44

irreparable harm." Winter, 129 S. Ct. at 375-76; see NRC, 550 F.2d at 750 ("The most

significant condition which must be present to support the granting of a temporary injunction is a

showing that if the relief is not granted irreparable injury during the pendency of the trial *will*

result." (emphasis in original) (quoting Capital City Gas Co. v. Phillips Petroleum Co., 373 F.2d

128, 131 (2d Cir. 1967))).

     For example, in Hudson Riverkeeper Fund v. Yorktown Heights Sewer District, 949 F.

Supp. 210 (S.D.N.Y. 1996), the plaintiff environmental organization brought a CWA citizen suit

alleging that defendants were discharging pollutants from their wastewater treatment plant in

excess of permissible limits, thereby contaminating the New Croton Reservoir (among other

bodies of water). Id. at 211. Plaintiff's expert averred that defendants' discharges had caused

potential environmental harm, including potential harm to New York City's drinking water

supply. Id. Judge Rakoff concluded that there was "no question that defendants' wastewater

treatment plant ha[d] repeatedly discharged pollutants in excess of limits set by applicable

[SPDES] permits; but the extent of the offending efflux appears minimal." Id. "In the absence

of harder proof of real and immediate injury, plaintiff fail[ed] to qualify for preliminary

injunctive relief." Id. at 212.

     The Supreme Court has also established that preliminary injunctive relief is not warranted

when the alleged CWA violations are merely procedural or technical. See Weinberger, 456 U.S.

305. Instead, in determining whether a plaintiff has shown that irreparable harm is imminent, a

court must look to the underlying purpose of the CWA. See Amoco, 480 U.S. at 542-44;

Weinberger, 456 U.S. at 314-15. Weinberger arose out of the allegation that the Navy was

violating the Federal Water Pollution Control Act (the "FWPCA," the precursor to the CWA) by

discharging ordnance into the waters off Puerto Rico without having obtained a permit from the

EPA. 456 U.S. at 306-08. The Supreme Court held that despite the clear statutory violation, the district court had discretion to refuse to grant preliminary injunctive relief. See id. at 320. The Court reasoned that Plaintiff had not shown that the discharges were polluting the waters, and that "the objective of the FWPCA [and now the CWA] is to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters,'" not to maintain "the integrity of the permit process." Id. at 314 (quoting 33 U.S.C. § 1251(a)). "The lessons of [the Weinberger and Amoco] decisions are clear: The City must prove more than procedural permit violations in order to secure an injunction." See Anglebrook, 891 F. Supp. at 926.

Here, after reviewing the parties' voluminous submissions, the Court concludes that Plaintiff has failed to meet its "heavy burden of clearly establishing the threat of irreparable harm." See NRC, 550 F.2d at 753. The principal allegation in this case is that the Sarna Defendants are responsible for discharges of stormwater runoff into Brown's Pond, causing increased turbidity in violation of New York's ECL and the SPDES permit, and threatening the City's secondary water supply. (See Pl.'s Mem. at 2-3.) Each of the three relevant SPDES permits authorizing construction-related stormwater discharges—GP-0-08-001, GP-02-01 and GP-93-06—provide, in substantially identical language, that it is a violation of the permit for any such discharge to "cause or contribute" to a violation of New York water quality standards, including that there "shall be no increase in turbidity that will cause a substantial visible contrast to natural conditions." GP-0-08-001 Part I.B (quoting N.Y. Comp. Codes R. & Regs. tit. 6, § 703.2). This is not a merely procedural or technical requirement; however, Plaintiff's evidence does not clearly establish the likelihood of imminent irreparable injury.

### 1.   The 2001, 2004 and 2007 Aerial Photos

Plaintiff submits a series of three New York State aerial surveillance photos, allegedly

taken in 2001, 2004 and 2007, which appear to show a change in the color of part of Brown's

Pond. (See Aff'n of Marc S. Gerstman in Supp. of Mot. for Prelim. Inj., Sept. 11, 2009

("Gerstman Aff'n"), ¶ 63 & Ex. L.)  In the photos, the small, southwestern portion of Brown's

Pond adjacent to the Mt. Airy Development goes from blue to light brown; in the 2007 photo, the

brownish tint has partially invaded the much larger portion of the Pond located across Mt. Airy

Road.

The Court is unwilling to place too much weight on these photos.  They are undated, and

it is unclear under what conditions they were taken (for example, during an extended period of

dry weather, or immediately after a severe rain storm), or whether the colors are misleading.

Nevertheless, the photos are, at least on their face, suggestive of past environmental harm.  They

are referenced in a November 26, 2008 letter from the New York State Department of Health

("NYSDOH") to the Town of New Windsor and City of Newburgh, expressing concern that "the

water quality in Brown's Pond has likely deteriorated in recent years." (Gerstman Aff'n Ex.

NN.)  The NYSDOH letter states that the aerial photos "show what appears to be significant

changes in turbidity and sedimentation between the years 2001 and 2007," likely the result of

"development in the Brown's Pond watershed." (Id.)

However, even assuming the photos are credible, they do not constitute evidence of an

"actual, viable, presently-existing threat," see Anglebrook, 891 F. Supp. at 925, as the last photo

was taken in 2007, at least seventeen months before the Complaint was filed in this action.

Indeed, Plaintiff's case rests largely on alleged CWA violations from the relatively distant past,

dating back to the early 2000s.  Since April 2008, when construction of the Development's

47

redesigned sediment basins was completed, Plaintiff alleges only *two* instances of sediment discharge, which, as explained below, appear to have been isolated events—not proof of a clear and present threat warranting preliminary relief before an adjudication on the merits. In other words, even if the color of Brown's Pond changed between 2001 and 2007, as the aerial photos suggest, and even if the construction of Mt. Airy Estates contributed to the change, that does not provide a basis for preliminarily compelling an expensive overhaul of the Development's current stormwater management system, when the evidence before the Court suggests it very well may now be functioning adequately.

### 2.  Post-April 2008 Incidents

In accordance with the obligations imposed by the ACOE's 2007 Restorative Order, which rescinded the 2006 Cease and Desist Order and allowed construction to continue at the Development, the main sediment basins for the Development were "completely rebuilt in 2007 and 2008 to enhance the ability to treat runoff."[2]  (See Aff. of John H. Crow, Ph.D., Sept. 24, 2009 ("Crow Aff."), ¶¶ 18-20.)[3]  The ACOE approved the redesign of the basins, monitored the construction and consulted with Dr. Crow and his employees. (See id.; Gerstman Aff'n Ex. Z (ACOE Restorative Order).)  Rebuilding the basins cost the Sarna Defendants more than $600,000. (Aff'n of J. Benjamin Gailey, Sept. 25, 2009 ("Gailey Aff'n"), ¶ 14.)  Construction of the redesigned basins was substantially completed in April 2008. (Id. ¶ 20.)  Plaintiff does not dispute any of the foregoing; instead, it claims the basins still are not functioning properly.

---

[2] A sediment basin is a temporary pond built at a construction site to protect the quality of a nearby body of water—here, Brown's Pond—by capturing eroded or disturbed soil that is washed off during rainfall; the sediment-laden soil settles in the basin before the runoff is discharged.

[3] Dr. Crow is a professional wetlands, water and soil consultant with over forty-six years of experience; the president of an environmental consulting firm; and a long-time professor in ecology courses at Rutgers University. (Crow Aff. ¶¶ 1-3.)

48

However, Plaintiff alleges only two incidents of flooding and sediment discharge from the basins into Brown's Pond since April 2008. Plaintiff has submitted photos documenting the incidents. (See Aff. of John Platt in Supp. of Mot. for Prelim. Inj., Sept. 10, 2009 ("Platt Aff."), Exs. J, L.)[4] Both incidents occurred after very heavy rainfall. The first incident occurred on December 12, 2008, after a storm that dropped 2.8 inches of rain. (See Gailey Aff'n Ex. D (Daily Precipitation Report for Town of New Windsor Wastewater Facility ("Precip. Rpt.")).) The second incident occurred on June 15, 2009; it had rained 5.6 inches in the previous week, and 3.0 inches on June 14 and 15 alone. (See id.) There were, of course, other heavy rainfalls during the thirteen-month period after the redesigned basins were completed and before Plaintiff filed its Complaint, but December 12, 2008 and June 15, 2009 are the only two dates on which Plaintiff alleges excessive sediment discharge from the basins.

The Sarna Defendants have submitted evidence tending to show that neither the December 2008 nor June 2009 discharge was caused by a failure of the reconstructed sediment basins. A site construction manager for the Development avers that the December 12, 2008 discharge was the result of subcontractor error. (Aff. of Constantino Calinda, Sept. 25, 2009 ("Calinda Aff."), ¶¶ 1-4.) At the time of the storm, the subcontractor's crew was in the process of installing drainage catch basins in a new road in the Development. (Id. ¶ 3.) When a catch basin is incomplete, it is standard practice to divert drainage away from the basin by placing hay bails on its uphill sides. (Id.) However, the site manager's affidavit states that on December 12, 2008, the subcontractor neglected to protect the unfinished basins. (Id.) As a result, untreated stormwater flowed into the unfinished basins, and then directly into the main sediment basins,

---

[4] John Platt has served as the Superintendent of Water for Newburgh's Water Treatment facility since 1997. (Platt Aff. ¶ 1.)

causing excessive sediment in the main basins that would not have been present if the unfinished catch basins had been properly protected.  (Id. ¶ 4.)

The Sarna Defendants claim that the excessive sediment discharge from the main basins on June 15, 2009, was the result of a homeowner's recklessness.  (Aff. of Marvin Rosenzweig, Sept. 25, 2009 ("Rosenzweig Aff.").)  After purchasing the property in question, the homeowner removed the lawn surrounding the house, as well as all trees and other vegetation, and imported dirt fill to raise the property's elevation.  (Id. ¶ 2.)  Photos attached to the affidavit of Mr. Rosenzweig, also a site construction manager at the Development, show that as of June 15, 2009, the area around the house consisted entirely of recently imported and unstable dirt, with no erosion control measures.  (See id. Ex. A.)  During and after three inches of rainfall on June 14 and 15, sediment-laden stormwater poured off the property, causing excessive sediment to enter the main basins.  (Id. ¶ 3.)  Mr. Rosenzweig avers that when the homeowner then refused to install erosion control measures, Mt. Airy crews placed hay bails on the downstream sides of the property.  (Id. ¶ 5.)  Just three days later, on June 18 and 19, it rained 2.7 inches (Precip Rpt.), and Plaintiff does not allege improper sediment discharge on those dates.

The Court has also reviewed video submitted by Plaintiff of the June 15, 2009 flooding, which shows it was not immaterial.[5]  That is hardly surprising, as it occurred after a massive rainfall—5.6 inches in a week, and three inches on June 14 and 15 alone.  However, the Sarna Defendants' evidence shows that at least a large amount of the excessive sediment in the runoff was the result of the unstable dirt fill on one homeowner's property, which had been stripped of all vegetation without the installation of erosion control measures.  Further, just a few days later, when it rained nearly three inches, Plaintiff does not allege a failure of the stormwater

---

[5] Plaintiff states that the video is from "June, 2009" (Gerstman Reply Aff'n ¶ 18); given that it appears to show many of the same scenes depicted in the photos of the June 15 incident (see Platt Aff. Ex. L), the Court presumes that the video is from June 15, 2009.

management system; and, as discussed below, turbidity measurements taken under drier, more typical conditions, are inconclusive.

In short, the totality of the evidence cited above tends to show that the excessive sediment discharges in December 2008 and June 2009 were isolated events, not proof of an imminent threat of irreparable harm. It is important to note that the Court is considering the issue of causation in the context of irreparable harm, not Plaintiff's likelihood of success on the merits. After all, it is a violation of the ECL and SPDES permit to "either cause *or contribute to*" a violation of State water quality standards, see GP-0-08-001 Part I.B (emphasis added), and even if the Sarna Defendants' explanation of events is accepted, it would not preclude a finding that they contributed to the discharges.

However, for purposes of determining whether irreparable harm is sufficiently likely to warrant preliminary injunctive relief, the evidence before the Court shows that: the Mt. Airy Development's main sediment basins were redesigned and reconstructed in consultation with the ACOE; in the thirteen months after they were completed, Plaintiff alleges only two instances of excessive sediment discharge; both incidents occurred after extremely heavy rainfall; and the Sarna Defendants have submitted credible evidence suggesting both events were caused by external factors. Such a record does not clearly establish an immediate threat of irreparable harm.

Plaintiff also submits turbidity measurements from samples taken during and after the December 12, 2008 and June 15, 2009 incidents. (See Aff. of Robert J. Pape in Supp. of Mot. for Prelim. Inj., Sept. 9, 2009 ("Pape Aff."), ¶¶ 20-33; Platt Aff. ¶¶ 49-55.)[6] Turbidity is measured in Nephelometric Turbidity Units ("NTU")—the higher the NTU value, the less clear

---

[6] Robert J. Pape is a "chemical engineer in the environmental engineering field," with over twenty years of experience. He was retained by Plaintiff in 2008 to provide engineering services related to the review and inspection of the Mt. Airy Development's stormwater management system. (See Pape Aff. ¶¶ 1-5.)

the water. (See Pape Aff. ¶ 22.) Since, as discussed above, the Sarna Defendants do not dispute
(but rather offer explanations for) the discharges on December 12 and June 15, Plaintiff's
samples, showing elevated NTU values at those times, do not affect the Court's conclusion
regarding the likelihood of future injury. Further, insofar as Plaintiff offers the December 2008
and June 2009 samples as evidence of increased turbidity causing "a substantial visible contrast
to natural conditions," see GP-0-08-001 Part I.B, the Court assigns the data little weight—as Dr.
Crow explains, large storms naturally cause the discharge of increased sediment, and stir up
existing sediment, causing NTU values to rise in all water bodies (Crow Aff. ¶ 7.)

        In addition to the December 2008 and June 2009 incidents, Plaintiff alleges that untreated
runoff entered Brown's Pond on May 18, 2009. (Platt Aff. ¶¶ 31-32.) Plaintiff does not allege
that the sediment basins failed, or that any sediment from the basins entered Brown's Pond. (See
id.) Instead, Plaintiff claims that the sediment basins were full, and that the Sarna Defendants'
employees were observed pumping water from the basins into the surrounding woods. (Id.) The
Sarna Defendants contend that no water was pumped out of the basins; instead, water was
pumped out of a stormwater management pond to access and clean the sediment screen at the
bottom of the pond—as per the SWPPP. (Calinda Aff. ¶¶ 5-8.) Sediment socks were used on
the pump intakes, and only clean water was pumped into the woods. (Id. ¶ 7.) The Court finds
the Sarna Defendants' account credible, especially as Plaintiff does not rebut their explanation in
its reply papers. In any event, the evidence relating to the May 19 incident falls short of clearly
establishing an imminent threat of irreparable harm.

        Finally, the Court notes that the preceding discussion in no way undermines the Court's
earlier holding, see supra Discussion I.D, that Plaintiff's pleading satisfies the CWA's
continuous violation requirement. Plaintiff's "good-faith" allegations of continuous violation are

52

sufficient to defeat the Sarna Defendants' motion to dismiss for lack of subject-matter jurisdiction, see Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., 989 F.2d 1305, 1311-12 (2d Cir. 1993); in sharp contrast, Plaintiff is not entitled to preliminary injunctive relief unless it meets the heavy burden of clearly establishing the "actual and imminent" threat of irreparable harm that could not be remedied after a trial on the merits. See Faiveley, 559 F.3d at 118.

In sum, after reviewing the evidence submitted in connection with the December 12, 2008 and June 15, 2009 incidents, the Court finds it *possible* that the redesigned sediment basins, and the rest of the Development's stormwater management system, are not functioning adequately; however, the Court finds it equally likely that the December 12 and June 15 discharges were isolated events. Mere possibility is not a sufficient basis for ordering preliminary injunctive relief. Winter, 129 S. Ct. at 375-76.

### 3.    Turbidity Measurements Taken Under More Typical Conditions

Both Plaintiff and the Sarna Defendants also submit data from samples taken under more typical conditions on various days in the first half of 2009. After reviewing the various data, the Court finds it to be inconclusive.

The Sarna Defendants had samples taken by an independent testing company on June 22, June 26 and July 2, 2009. (Crow Aff. ¶ 13.) The samples show NTU levels lower in the small section of Brown's Pond adjacent to the Development than at sampling locations in the larger portion of the Pond across Mt. Airy Road, and in nearby Washington Lake. (See id. Exs. A-B.) Dr. Crow avers that he has "reviewed the lab results," and that they show the turbidity in the small part of the Pond bordering the Development "is better, or no worse, than the other portions of the water bodies." (Id. ¶¶ 13-16.)

53

In his reply affidavit, Plaintiff's engineer, Mr. Pape, does not contest the accuracy of the Sarna Defendants' data, acknowledging that "Dr. Crow shows that the small portion of Brown's Pond adjacent to the stormwater basins . . . can have turbidity levels as low as 1.8." (See Supplemental Aff. of Robert J. Pape in Opp. to Mot. to Dismiss and in Further Supp. of Mot. for Prelim. Inj., Oct. 15, 2009 ("Pape Reply Aff."), ¶ 37.) Instead, Mr. Pape merely points to the elevated turbidity levels in the samples taken after the December 12, 2008 storm event. (See id.) Moreover, the Court notes that the sample yielding the low, 1.8-NTU reading was, in fact, taken on a day (July 2, 2009) when it rained 0.67 inches, after 0.97 inches of rain the day before (see Precip. Rpt.), suggesting that the Development's stormwater management system was functioning properly during rainy weather.

Plaintiff's sampling data from the first half of 2009 is inconclusive. For example, the City Water Department collected samples on ten days in April and May 2009. (Platt Aff. ¶ 45 & Ex. N.) On each day, turbidity was sampled (1) in the small section of Brown's Pond adjacent to the Development, and (2) in the larger portion of the Pond across Mt. Airy Road. (See id.) On seven of the ten days, the turbidity in the smaller section of the Pond was slightly higher than in the larger portion; on two of the days, the turbidity was almost exactly the same; and on one day, the turbidity in the larger portion of the Pond was higher. (See id. Ex. N.) The turbidity of the smaller part of the Pond was lower on the three sampling days in May than it had been in April. (See id.). Further, the NTU values (for both locations) were relatively low: the Development side of the Pond averaged 2.19 NTU; the part of Pond across Mt. Airy Road averaged 1.69 NTU. (See id.)

The New York water quality standard at issue in this case—"a substantial visible contrast to natural conditions"—is inherently subjective. Vermont's water quality standards, for

example, are more quantitative, mandating that the turbidity in Class A public water supplies are "not to exceed 10 NTU . . . as an annual average under dry weather base-flow conditions." (See Crow Aff. Ex. G (Vt. Water Quality Standards § 3-03(B)(1) (2008)).) The City Water Department's sampling data for Brown's Pond from April and May 2009 show turbidity in dry-weather conditions holding steady well below 10 NTU. Contrary to Plaintiff's assertion, it is not at all inappropriate for the Court to consider another state's water quality standards. See In the Matter of the Application for an SPDES Permit for the Discharge from the Shandaken Water Tunnel, 2006 N.Y. Env. LEXIS 44 (Dep't of Envt'l Conserv. Jan. 27, 2006). In the Shandaken administrative proceeding, the Commissioner of the NYSDEC approved the NYSDEC staff's decision to set "an increase of 15 NTU as an effluent limit" in an SPDES permit issued for the discharge of water from the Shandaken Water Tunnel into Esopus Creek, a trout stream used for fly fishing; in reaching the conclusion that 15 NTU was an appropriate limit, "Criteria established by other states with respect to turbidity were examined." See id. at *4-8.

The Court notes that it is in no way questioning the wisdom of the New York turbidity standard. The Court's task is not to ask whether New York's "substantial visible contrast" standard is the best way to control pollution; engaging in such an inquiry "would be inconsistent with the Congressional intent to preclude 'reanalysis of technological [or] other considerations at the enforcement stage.'" See Mumford Cove Ass'n, Inc. v. Groton, 640 F. Supp. 392, 395 (D. Conn. 1986) (Cabranes, J.) (quoting S. Rep. No. 414, 92nd Congress, 1st Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 3668, 3745). Instead, this Court, like others before it, simply considers the parties' sampling data, as well as comparable regulations from a nearby state, in determining whether the Sarna Defendants are causing irreparable harm to Brown's Pond. The data from April and May 2009 does not support such a conclusion.

Of course, the New York standard prohibits discharges that will cause a "substantial visible *contrast* to natural conditions," N.Y. Comp. Codes R. & Regs. tit. 6, § 703.2 (emphasis added), so NTU values could be low, even where discharges are harming a body of water by causing such a contrast. However, the April and May 2009 data not only show relatively low NTU values; they also show the absence of an alarming trend. In fact, the NTU values for the small part of the Pond bordering the Development are lower in May than in April. (See Platt Aff. Ex. N.) Nor does there appear to be a statistically meaningful difference between the turbidity levels in the two sections of the Pond—on two of the ten days, the NTU values were nearly identical and on one of the days, the turbidity was greater in the portion of Brown's Pond that does not border the Development. In sum, the April and May 2009 sampling data is inconclusive.

Plaintiff also submits data from samples taken on four days in February and March 2009 at five different locations, including in Brown's Pond directly across from the Development; a spot at the far northern side of Brown's Pond; and Washington Lake. (See Platt Aff. ¶¶ 57-61 & Exs. P-Q.) This data is similarly inconclusive. On February 18 and 26, the turbidity in the Pond close to the Development was higher than the turbidity at the other four locations; however, on March 5, the turbidity of the water closest to the Mt. Airy Development was lower than the turbidity at the other four locations, and significantly lower than the turbidity at the far reaches of the Pond; and, on March 12, the turbidity at all five locations was nearly the same (between 1.86 and 3.4 NTU). (See id. ¶¶ 57-61.)

In sum, having reviewed the sampling data submitted by both sides, the Court concludes that it does not support an award of preliminary injunctive relief.

56

### 4.    Impact on the City's Water Supply

The City attempts to convey a sense of urgency by repeatedly insisting that the alleged

discharges pose an imminent threat to the quality of its water supply.  (See, e.g., Pl.'s Mem. at 1-

3.)  The evidence before the Court does not support that claim.

As noted above, on November 26, 2008, the NYSDOH sent a letter to the City of

Newburgh and the Town of New Windsor expressing concern about the water quality in Brown's

Pond.  On January 20, 2009, just four months before filing its Complaint, Plaintiff responded via

letter, stating:

> Not to minimize the effects of the increased stormwater runoff
> entering the City's reservoir system, [but] due to the volume and
> length of travel stormwater must travel, discharges are diluted and
> settled out of the water before it enters the intake structure and is
> directed to the filtration plant for treatment.

(Gerstman Aff'n Ex. OO (Ltr. from John Platt, Acting City Mgr., to NYSDOH, dated Jan. 20,

2009, at 2.)

The letter goes on to detail the capabilities of Plaintiff's filtration plant, and states:

> All of the City's processes utilized at the filtration plant allow the
> City's potable water supply to stay well within regulatory
> mandated requirements.  The City's system would also be able to
> treat water of lesser quality than the normal water quality
> associated with the City's surface water reservoirs including
> Brown's Pond . . . .  Additionally, . . . [d]ue to [the City's
> expansive] treatment capacity, the City would be able to treat raw
> water of a lesser quality without creating an undue strain on plan
> treatment processes.

(Id. at 3.)  This letter indicates that the alleged threat to the City's water supply is not actual and

immediate.

Further, the sampling data submitted by both sides suggests that the turbidity in the

allegedly offensive section of Brown's Pond next to the Development—and elsewhere in

Brown's Pond—is either lower or not materially different than the turbidity in Washington Lake, the City's *primary* water supply. (See Crow Aff. Exs. A-B (reporting turbidity of 1.8 and 8.5 NTU in the small section of the Pond on June 22 and July 2, 2009, less than the 8.0 and 44.0 NTU measured in Washington Lake); Platt Aff. ¶¶ 57-61 & Ex. Q (showing nearly identical turbidity—ranging from 2.0 to 2.56 NTU—in the Pond close to the Development and at the Washington Lake intake on March 5 and March 12, 2009).)[7]

Plaintiff correctly points out that turbidity comparisons between Brown's Pond and Washington Lake do not bear on whether Brown's Pond *itself*—the body of water receiving the allegedly improper discharges—is likely to suffer irreparable environmental injury in the absence of an injunction. Put differently, it seems as if a municipality could successfully establish an imminent threat of environmental injury—that is, an increase in turbidity that "will cause a substantial visible contrast to natural conditions"—while failing to show any real and immediate threat to its water supply. In any event, the Court has already determined that the record does not establish that Brown's Pond is likely to suffer irreparable environmental injury in the absence of an injunction; Plaintiff has likewise failed to establish a clear and present threat of irreparable harm to its water supply.[8]

---

[7] In his affidavit, Mr. Pape notes that the EPA's National Primary Drinking Water Regulations "require that *filtered drinking water* turbidity levels be below 1 NTU." (Pape Aff. ¶ 23 (emphasis added).) That is irrelevant; the turbidity standards for filtered drinking water are not to be confused with the turbidity standards for water sitting in a reservoir pre-filtration.

[8] In addition to the "substantial visible contrast" standard, the Complaint references another State water quality standard: "There shall be no increase in suspended, colloidal and settleable solids that will cause deposition or impair the waters for their best usages." (Compl. ¶ 32 (citing N.Y. Comp. Codes R. & Regs. tit. 6, § 702.3).) As noted herein, the best usages of Class A-S waters like Brown's Pond are "as a source of water supply for drinking, culinary or food processing purposes; primary and secondary contact recreation; and fishing." N.Y. Comp. Codes R. & Regs. tit. 6, § 701.4. Plaintiff has not made an effort to show likely impairment of a "best usage" of Brown's Pond other than as a water supply.

## 5.    Plaintiff's Delay in Filing Suit

An additional factor that militates against awarding preliminary injunctive relief is Plaintiff's delay in bringing this suit. Plaintiff claims that "almost from the inception of the Mt. Airy project [in 1999], [the Sarna Defendants have] failed to effectively control stormwater discharge." (Pl.'s Mem. at 7.) Yet Plaintiff did not file its Complaint until June 2, *2009*.

The Sarna Defendants do not raise the equitable defense of laches; nor does it appear as if they could establish that defense, as it would require showing they were prejudiced by Plaintiff's delay. See Allens Creek/Corbetts Glen Preservation Group, Inc. v. West, 2 F. App'x 162, 164 (2d Cir. 2001). Further, laches is "only rarely invoked in environmental cases." NRDC v. U.S. Army Corps of Eng'rs, 399 F. Supp. 2d 386, 402 (S.D.N.Y. 2005).

However, "Although a particular period of delay may not rise to the level of laches . . ., it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985). In other words, "Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm." Majorica, S.A. v. R.H. Macy & Co., Inc., 762 F.2d 7, 8 (2d Cir. 1975); see Weinberger, 456 U.S. at 310 n.5 (noting without disapproval that district court, in properly denying preliminary injunctive relief, "took into consideration the delay by plaintiffs in asserting their [FWPCA] claims [and] concluded that although laches should not totally bar the claims, it did strongly militate against the granting of injunctive relief").

Here, Plaintiff alleges CWA violations dating back almost a decade, yet did not file suit until June 2009. Further, the record makes clear that Plaintiff was aware of the alleged violations from the very beginning. (See, e.g., Platt Aff. ¶ 12 (stating that "[e]arly in [his] tenure with the

City"—which began in 1997—he "became concerned with the impact of stormwater runoff from

the Mt. Airy development upon Brown's Pond"); Pl.'s Mem. at 11-14 (noting alleged SWPPP

deficiencies beginning in 2003).) Now, after years of inaction—and after an eighteen-month

period in which only *two* incidents of excessive sediment discharge are alleged—Plaintiff moves

this Court for the "extraordinary remedy" of a preliminary injunction. See Winter, 129 S. Ct. at

375. Plaintiff's delay seriously undermines its attempt to convey any sort of urgency; it indicates

the lack of a truly immediate threat of irreparable harm, and weighs against granting preliminary

relief.[9]

### 6.    Alleged Technical and Procedural Violations of the CWA

Although the principal allegation in this case is that turbid discharges have violated the

ECL and SPDES permit, that is not the only CWA violation alleged in the Complaint. Plaintiff

also alleges, inter alia, that (1) the Sarna Defendants, after initially obtaining coverage under GP-

93-06, neglected to follow the procedural steps necessary to maintain coverage under GP-02-01

and GP-0-08-001, such that their discharges are unauthorized (see Pl.'s Mem. at 4 (arguing that

the Sarna Defendants' coverage lapsed because they failed to file new notices of intent to be

covered)); and (2) the SWPPP for the Development impermissibly deviates from the technical

design requirements contained in the most current version of the NYSDEC's Standards and

Specifications for Erosion and Sediment Control manual (see id. at 10; Pape Reply Aff. ¶¶ 56-

64). Both sides expend considerable energy debating the merits of these allegations.

Yet these and the several other similarly secondary CWA violations alleged in the

Complaint are the sort of procedural and/or technical violations that do not warrant preliminary

---

[9] So, frankly, does Plaintiff's rather desultory approach to moving for preliminary injunctive relief. Rather than file a motion and demand an immediate hearing, Plaintiff itself proposed a leisurely briefing schedule, which occurred more than three months after the filing of the Complaint. Plaintiff's behavior as a litigant has not exhibited any sense of urgency, so it is hard for the Court to feel any sense of urgency.

injunctive relief, as the Supreme Court has made clear. See Amoco, 480 U.S. at 544 (holding that in deciding whether to grant preliminary injunctive relief for violations of an environmental statute, it is error to "focus[] on the statutory procedure rather than on the underlying substantive policy the process was designed to effect"); Weinberger 456 U.S. at 315 (finding preliminary injunction unwarranted where Navy's discharges of ordnance did not pose threat of irreparable environmental harm, even though Navy had failed to apply for permit authorizing its discharges); see also Anglebrook, 891 F. Supp. at 925 ("Injunctive relief . . . is not automatically available upon a finding of technical statutory violations.").

Anglebrook is instructive in this regard. In Anglebrook, plaintiff the City of New York brought a CWA citizen suit seeking to enjoin the development of a golf course because the SWPPP for the project allegedly failed to comply with the technical design requirements for stormwater runoff control. See 891 F. Supp. at 911-12. Judge Parker held that "even if we were to find that [defendant's] plan contains some deficiencies, the City has failed to prove that any of those deficiencies will cause irreparable harm to the City's reservoirs or to its drinking water. Without that proof, the City is not entitled to injunctive relief." Id. at 925. Judge Parker also rejected the City's argument that "any SWPPP violation would directly and critically upset the [CWA's] objective, thereby establishing the risk of irreparable harm." See id. at 926.

In sum, Plaintiff alleges only two—apparently aberrant—incidents of improper sediment discharge in the thirteen months after completion of the redesigned sediment basins; further, the turbidity data, considered as a whole, is inconclusive. Based on that evidence, the Court finds that Plaintiff has failed to clearly establish an actual and immediate threat to the "integrity" of Brown's Pond or the City's water supply. In light of that finding, and consistent with the Supreme Court's teaching in Weinberger and Amoco, the Court concludes that the remaining

procedural and technical CWA violations alleged in the Complaint do not afford grounds for preliminary injunctive relief.

### 7.    State-Law Claims

Plaintiff alleges not only a CWA claim, but also state-law claims for public nuisance and trespass. As with the CWA claim, Plaintiff fails to show a threat of irreparable harm with respect to either of its state-law causes of action.

Plaintiff's nuisance claim is essentially a state-law version of the core CWA allegation: Plaintiff claims that the alleged discharge of stormwater runoff from the Development into Brown's Pond threatens the City's water supply, creating a public nuisance. (See Compl. ¶¶ 123-26 ("[The Sarna Defendants'] actions in violating the CWA threaten the City's secondary water supply . . . in a manner which creates a public nuisance.").) As discussed above, Plaintiff has failed to clearly establish an actual and imminent threat of irreparable harm to its water supply. Thus, Plaintiff is not entitled to preliminary injunctive relief on its nuisance claim.

The City's trespass claim is based on the allegation that the Sarna Defendants have installed certain stormwater management structures in Brown's Pond, and on City-owned land around the Pond, without the City's permission and in violation of the terms of a limited easement granted to Mt. Airy Estates in 1975. The easement, a copy of which is attached as Exhibit F to the Gerstman Affirmation, was granted to Mt. Airy Estates "for the purpose of discharge of surface waters onto lands owned by the [City] consisting of 8.108 acres located on the westerly side of Mt. Airy Road in the Town of New Windsor," and gave Mt. Airy Estates "permission to enter the said property to install certain culverts and headwalls," and "for the cleaning and maintenance thereof." The City's principal objection concerns the Sarna Defendants' placement—in the summer or fall of 2008—of a containment boom close to the

shore of the small part of Brown's Pond next to the Development. The Sarna Defendants respond that the containment boom—as well as a filter placed on the intake of the culvert connecting the two sections of Brown's Pond under Mt. Airy Road—are "temporary" measures necessary to protect the Pond during the stabilization of the redesigned sediment basins. (See Gailey Aff'n ¶ 29; Aff. of Darin J. DeKoskie, Sept. 25, 2009, ¶ 28.)

The Court need not address the merits of Plaintiff's trespass claim, as Plaintiff fails to show that the Sarna Defendants' alleged trespass has caused an immediate threat of irreparable injury. As explained above, the record before the Court—and particularly the fact that Plaintiff alleges only two incidents of sediment discharge since the completion of the redesigned basins— leads it to conclude that Brown's Pond is not in imminent danger of irreparable injury. As for the containment boom and filter, the Court finds it credible that they were installed to temporarily protect the Pond. Simply put, removal of the structures—if warranted—can abide an adjudication on the merits. Accordingly, the Court finds that Plaintiff is not entitled to preliminary injunctive relief on its trespass claim.

### 8.    Scope of the Relief Sought

It is well-established that the purpose of a preliminary injunction is "not to award the movant the ultimate relief sought in the suit but is only to preserve the status quo." NRC, 550 F.2d at 754; see Triebwasser & Katz v. AT&T Co., 535 F.2d 1356, 1360 (2d Cir. 1976) (noting that "the normal function of the preliminary injunction is to maintain the status quo pending a full hearing on the merits," and reversing district court's grant of preliminary injunction that "would in effect give the plaintiffs substantially the ultimate relief they seek . . . before there has been any trial of the issues").

This principle weighs against granting Plaintiff's motion for a preliminary injunction, as the preliminary relief sought by Plaintiff—an injunction compelling the potentially costly redesign of the Mt. Airy Development's stormwater management system and the removal of certain structures from City property, and prohibiting the construction of thirteen additional homes—is largely the same as the ultimate relief sought by Plaintiff in its Complaint (minus the monetary penalties). As for the planned expansion, Plaintiff's assertion that the additional homes pose a threat of irreparable harm is speculative. (See, e.g., Pl.'s Mem. at 15-16 (speculating that if expansion is not prohibited, "it may be physically impossible for [the Sarna Defendants] to develop a functioning SWPPP").) Plaintiff does not provide any proof that construction of the additional homes will have any effect on Brown's Pond or the City's water supply. The Court therefore declines to enjoin the expansion.

In sum, the Court holds that Plaintiff fails to meet its heavy burden of clearly establishing an "actual and imminent" threat of irreparable harm that warrants preliminary relief before a trial on the merits. See Winter, 129 S. Ct. at 375-76; Faiveley, 559 F.3d at 118. The Court need not address the other requirements for obtaining a preliminary injunction. See NRC, 550 F.2d at 750 (affirming district court's denial of preliminary injunction motion on ground that "appellant has failed to demonstrate by the required showing the threat of irreparable injury," making consideration of other requirements unnecessary). Accordingly, Plaintiff's motion for a preliminary injunction is denied.

## CONCLUSION

For the reasons set forth above, the Court grants the Sarna Defendants' motion to dismiss the civil penalty component of Plaintiff's CWA claim, and denies the Sarna Defendants' motion to dismiss in all other respects. The Court *sua sponte* dismisses the Complaint in its entirety as

against the Town of New Windsor. Plaintiff's motion for a preliminary injunction is denied.

The Docket Clerk is directed to remove Docket Nos. 22 and 29 from the Court's list of pending

motions.

Dated: February 5, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL